THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID ALEXANDER, Defendant-Appellant.

Third District No. 3—07—0915

Opinion filed May 13, 2009.

McDADE, J., concurring in part and dissenting in part.

Charles M. Schiedel and Duane E. Schuster (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (Terry A. Mertel and Judith Z. Kelly (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CARTER delivered the opinion of the court:

Following a jury trial, the defendant, David Alexander, was convicted of first degree murder for the stabbing death of Sylvester "Mike" Polnitz. 720 ILCS 5/9—1(a)(2) (West 2006). The defendant claimed the stabbing was self-defense. Alternatively, the defendant presented a second-degree-murder theory based upon an unreasonable belief in the justified use of force. The jury rejected both theories and found the defendant guilty of first degree murder. On appeal, the defendant claims: (1) the trial court erred by failing to *sua sponte* give Illinois Pattern Jury Instructions, Criminal, No. 24—25.09X (4th ed. 2000) (hereinafter IPI Criminal 4th); (2) trial counsel was ineffective by failing to request IPI Criminal 4th No. 24—25.09X; and (3) he was denied a fair trial because the trial court did not strictly comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). We affirm.

## FACTS

The defendant's trial began on October 1, 2007, with the selection of the jury. At the beginning of the jury *voir dire*, the trial court stated:

"I shall now at this time touch upon broad fundamental principles that are applicable to criminal cases. Do not consider these to be instructions of law. Those will be given to you later at the conclusion of the case. Now, the indictment that I just read to you or the charge against the defendant is not any evidence or presumption of guilt against the defendant. It's merely a formal charge necessary to place him on trial. The defendant is presumed to be innocent of the charge in the indictment. This presumption remains with him throughout the trial until you've been satisfied by the evidence beyond a reasonable doubt as to the guilt of the defendant, and the burden of proving the guilt of the defendant beyond a reasonable doubt is on the State. The law does not require the defendant to prove his innocence. The defendant is not required to present any evidence or testify, and if he chooses not to testify in this case, it cannot be held against him."

At that time, the court did not ask the potential jurors, individually or in a group, whether they understood and accepted these principles. The defendant did not object or request that the court question the potential jurors on these principles.

The court then proceeded to question each potential juror individually. During this questioning, the court asked the first juror the following questions:

"Do you have any bias against a person merely because he has been charged with a criminal offense? *** Will you follow the court's instructions regarding the law regardless of your own personal opinion? *** Will you decide the case without sympathy and prejudice? *** Will you give both the State and the defendant a fair trial? *** Can you wait until the entire case is over and you are actually back in the jury room deliberating before you begin to form your final opinion?"

The court asked substantially the same questions of each subsequent potential juror.

After the jury had been empaneled, the State presented its evidence. Trina Owens testified that she was present at the apartment of the defendant and his girlfriend Kim on the evening of June 22, 2007. When Owens arrived at the apartment, the defendant was not home. Owens and Kim drank an alcoholic beverage and talked for a few hours. Owens testified that she became intoxicated. When the defendant arrived home, he and Kim had a conversation. After that conversation, the defendant asked Owens whether she knew anything about Polnitz shoving and attempting to rape Kim. Owens told him, "No." Owens testified that the defendant seemed calm after this conversation.

Approximately 20 to 30 minutes later, the defendant left the apartment. Owens testified that before the defendant left the apartment, he was in the kitchen and was upset. After the defendant left, Owens looked out the front door to see what the defendant was doing. Owens saw the defendant standing near the front door of Polnitz's apartment. Owens went back inside the apartment to speak to Kim. Owens then went back outside and saw the defendant standing there looking upset. She then went back inside to speak to Kim again, trying to convince her to go and speak to the defendant. Owens then went back out the front door of the apartment onto the front porch. Owens testified that she then saw Polnitz and the defendant toward the back of the building. Owens testified that she felt panicky and went back into the apartment. She then went back outside and saw Polnitz and the defendant running toward an alley. Owens went back in the apartment to convince Kim to speak to the defendant, but Kim did not go

outside. Owens went back outside and walked toward the alley. Owens testified that when she reached the alley, she saw Polnitz bleeding and holding his side, and the defendant holding a knife. Owens told the defendant to stop and put down the knife. She then ran to a neighbor's house and asked someone to call 911. Owens then returned to the alley and saw the defendant, Polnitz, and a woman. Polnitz was on the ground and bleeding. Owens testified that she saw a lot of blood. Owens told them that she had called for help, and the defendant left soon thereafter.

Officer Brad Venzon testified that he was dispatched to an alley shortly after midnight on June 23, 2007. Venzon was the first responder to the scene. Venzon observed a woman kneeling over a man who was lying on his back in the alley. The man's left leg was covered in blood and there was a large amount of blood on the ground under his leg. Venzon approached the people in the alley. The man was barely conscious, and he was gasping for air. The woman told the officer that the man's name was Sylvester Polnitz and that he had been stabbed in the leg. The woman also told Venzon the name of the person who had stabbed Polnitz. Venzon applied pressure to Polnitz's leg in an attempt to stem the bleeding. A few minutes later, emergency medical personnel arrived. After securing the alley, Venzon walked back toward the apartment building. Venzon did not find any weapons or see any blood on the ground on the way.

Captain Tom Carr of the Peoria fire department testified that he responded to a report of a stabbing in an alley shortly after midnight on June 23, 2007. Carr arrived at the alley approximately two to three minutes after the initial report. Upon arrival, Carr observed Polnitz lying on the ground and bleeding heavily from a wound to his lower leg. Carr testified that Polnitz was also in respiratory distress when he arrived at the scene. Paramedics arrived approximately two to three minutes after Carr. Polnitz went into full arrest while still in the alley. The emergency medical personnel, including Carr, transported Polnitz to Saint Francis hospital while attempting cardiopulmonary resuscitation.

Officer Roberto Vasquez of the Peoria police department testified that he was assigned to follow the ambulance and stay with Polnitz at the hospital on June 23, 2007. Vasquez was present when Polnitz was pronounced dead at approximately 12:53 a.m.

Emily Foster testified that she lived in an apartment with her children, her aunt and Polnitz, who was her aunt's boyfriend. There were three apartments in the building—two apartments on the ground floor, and one upstairs. Emily lived in one of the ground-floor apartments, and the defendant lived in the other.

On Friday night, June 22, 2007, Emily and Polnitz walked from their apartment to a gas station to buy cigarettes. Emily testified that it was raining that night. When they returned home, they entered the back porch to go into their apartment. As they entered the porch, Emily heard someone banging on the front door. Emily stayed on the back porch while Polnitz walked around the building toward the front door. Emily then heard Polnitz yelling. Emily stepped off the back porch and saw Polnitz running toward the alley with the defendant following him. Emily testified that she did not see any blood on Polnitz at that time, nor was Polnitz limping. Emily ran after them into the alley. When Emily arrived at the alley, she saw Polnitz on his hands and knees crawling away from the defendant. Emily testified that she then saw the defendant stab Polnitz in his lower left leg. Emily yelled at the defendant, who turned and began yelling back at her. Polnitz told the defendant to leave her alone. The defendant turned back toward Polnitz and then ran back toward the apartment building. Emily ran to Polnitz. Polnitz stood up, walked a few feet and told her to call 911 before lying back down. Emily then called 911.

Detective Mark Lamb testified that he arrived at the scene of the stabbing at approximately 1 a.m. Lamb observed a large pool of blood in the alley. Lamb walked from the alley to the apartment building. He testified that he did not find a blood trail between the alley and the building. Lamb testified that a porch runs along the front of the building onto which the front doors of the apartments open. There were two small tables and two chairs on the front porch of the building near the front door of the defendant's apartment. Lamb did not see any tables near the front door of Polnitz's apartment. Lamb also testified that there was a rug on the porch and that there were numerous stains on the rug.

Officer Scott Bowers arrived to investigate the scene of the stabbing at approximately 2:15 a.m. on June 23, 2007. Bowers testified that it was raining that morning. Bowers searched the alley and the area between the alley and the apartment building. Bowers did not find a weapon or any signs of blood outside of the alley. He also did not find a weapon or any blood on the front porch of the building.

Dr. Violette Hnilica, a forensic pathologist, testified that she performed an autopsy on Polnitz on June 23, 2007. Hnilica testified that the cause of Polnitz's death was multiple stab wounds. Polnitz had multiple minor abrasions on the left side of his body. Polnitz also had three separate stab wounds; he had been stabbed once in the abdomen and twice in his lower left leg. One of the wounds in Polnitz's leg totally severed an artery and vein. Hnilica testified that this wound was the most rapidly fatal because it caused massive bleeding as blood

was pushed out of the artery with every beat of Polnitz's heart. The other stab wound to the leg did not go as far into the leg and did not bleed as forcefully. Polnitz was also stabbed in his abdomen. That wound was three inches deep, but went into fat in the abdomen and did not cause serious damage.

In his defense, the defendant presented the testimony of Edward Barry. Barry testified that he has lived in the same neighborhood as the defendant since the defendant was born. Barry also testified that the defendant has a reputation as a peaceful and nonviolent person.

The defendant testified that he arrived home at approximately 10 or 10:30 p.m. on June 22, 2007. The defendant's girlfriend, Kim, was crying and appeared upset. Kim eventually told the defendant that earlier that day Polnitz had knocked on the door of their apartment and then pushed the door in and attempted to sexually assault her. The defendant testified that Kim told him this information in pieces and was evasive. The defendant decided to go next door and speak to Polnitz. The defendant testified that he went outside onto the porch and then knocked on the front door of Polnitz's apartment. Polnitz's girlfriend told the defendant that Polnitz was not home, so the defendant went back into his apartment.

Approximately 30 to 45 minutes later, the defendant knocked on Polnitz's front door again. The defendant testified that he did not have anything in his hands at this time and that it was raining. The defendant knocked on Polnitz's door, which was not on the covered porch, and then stepped back onto the porch to get out of the rain. Polnitz then came around the outside of the house from the rear and walked onto the covered porch. The defendant testified that he greeted Polnitz and then asked him what happened between Polnitz and Kim. Polnitz became angry and began yelling at the defendant. The defendant turned to go back into his apartment. Polnitz said, "You ain't nothing but a little punk anyway," and hit the defendant on the back of his head. The defendant fell, and his hand hit a small table on the porch as he tried to catch himself. The defendant testified that there was a tire jack and a knife on the table. The defendant picked up the knife and turned toward Polnitz. As Polnitz advanced toward him, the defendant stabbed him in the abdomen. The defendant testified that he stabbed Polnitz because Polnitz was yelling at him and continuing to come toward him. The defendant thought that Polnitz was going to hit him again. After the defendant stabbed Polnitz, Polnitz continued to advance toward him, so the defendant stabbed him twice in the leg. The defendant was still on the floor of the porch when he stabbed Polnitz, who was standing over him. The defendant testified that he could not escape from Polnitz because there was a

porch railing on one side of him and the wall of the building on the other.

After the defendant stabbed Polnitz the third time, Polnitz ran toward the alley. The defendant testified that he then threw down the knife and followed Polnitz. When the defendant was approximately 15 feet away from Polnitz, he saw Polnitz trip and fall in the middle of the alley. At that point, Emily walked up behind the defendant and asked him what he was doing. The defendant told her "nothing" and walked back toward his apartment. At that time, the defendant did not think that he had badly hurt Polnitz. The defendant testified that he did not go back inside the apartment because he did not want Polnitz to "mess with" Kim or her daughter. Instead, the defendant got on a bus and eventually went to his sister's house. The defendant further testified that when he learned that Polnitz had died from the stab wounds, he turned himself in to the police.

In rebuttal, the State presented additional testimony from Detective Lamb. Lamb testified that he interviewed the defendant on June 24, 2007, which was video-recorded. The State played three small sections of the interview for the jury, totaling 10 seconds in duration.

The jury was also presented with evidence regarding the previous criminal convictions of both Polnitz and the defendant. Polnitz had been convicted of domestic battery in 2001 and disorderly conduct in 2003. The defendant was convicted twice of misdemeanor theft in 2003.

During the jury instruction conference, the State requested IPI Criminal 4th No. 24—25.09, and the defendant objected. This instruction provides:

> "A person who initially provokes the use of force against himself is justified in the use of force only if
>
> the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." IPI Criminal 4th No. 24—25.09.

The court ruled that sufficient evidence had been introduced to suggest that the defendant had initially provoked the use of force and allowed the instruction. Neither party requested IPI Criminal 4th No. 24—25.09X, which states, "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor."

The jury found the defendant guilty of first degree murder, and the defendant was sentenced to 35 years' imprisonment. The defendant appeals.

## ANALYSIS

■ First, the defendant contends that the trial court erred by failing to *sua sponte* give IPI Criminal 4th No. 24—25.09X, regarding a defendant's use of force when the defendant was not the initial aggressor. The defendant acknowledges that he did not request this instruction below, but claims the issue should be considered as plain error under Supreme Court Rule 451(c) (210 Ill. 2d R.451(c)) because the failure to instruct the jury of IPI Criminal 4th No. 24—25.09X threatened the fundamental fairness of the trial.

It is the parties' responsibility to prepare jury instructions and tender those instructions to the trial court. *People v. Underwood*, 72 Ill. 2d 124, 129, 378 N.E.2d 513, 515 (1978). "Generally, the trial court is under no obligation either to give jury instructions not requested by counsel or to rewrite instructions tendered by counsel." *Underwood*, 72 Ill. 2d at 129, 378 N.E.2d at 515. In addition, a party may not raise on appeal the failure to give a jury instruction unless that party tendered the instruction. 155 Ill. 2d R. 366(b)(2)(i). However, substantial defects in jury instructions are not waived for failure to make a timely objection if the interests of justice require. 210 Ill. 2d R. 451(c). "[T]he erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Hopp*, 209 Ill. 2d 1, 8, 805 N.E.2d 1190, 1194 (2004).

The defendant claims that the jury's determination of whether he was the initial aggressor was an essential element of the State's duty to prove beyond a reasonable doubt that the defendant was not justified in the use of force. The defendant further maintains that the trial court effectively instructed the jury that the defendant was in fact the initial aggressor by instructing them under IPI Criminal 4th No. 24—25.09, when a defendant is the initial aggressor, but by failing to *sua sponte* instruct it under IPI Criminal 4th No. 24—25.09X, when a defendant is not the initial aggressor. Thus, the defendant argues that he was denied a fair trial because the jury instructions directed the jury's finding as to an essential element of the case. The State disagrees, arguing that the trial court's failure to give IPI Criminal 4th No. 24—25.09X did not constitute plain error under Rule 451(c). The State contends that a determination of who was the initial aggressor in this case was not an essential element of the charged offense nor of the defendant's self-defense claim.

We first consider the defendant's contention that the trial court effectively instructed the jury to find that the defendant initially

provoked the use of force against himself by failing to *sua sponte* give IPI Criminal 4th No. 24—25.09X. The defendant relies upon the committee note to IPI Criminal 4th No. 24—25.09X to support his claim that the court erred by failing to give this instruction. That committee note states that in appropriate circumstances both IPI Criminal 4th No. 24—25.09 and IPI Criminal 4th No. 24—25.09X should be given. IPI Criminal 4th No. 24—25.09X, Committee Note.

In *People v. Hopp*, the Illinois Supreme Court found that the court erred when it failed to give a pattern jury instruction defining first degree murder where the defendant was charged with conspiracy to commit first degree murder. *Hopp*, 209 Ill. 2d at 7, 805 N.E.2d at 1194. In that case, the jury was instructed under IPI Criminal 4th No. 6.03 of the elements of the crime of conspiracy. *Hopp*, 209 Ill. 2d at 7, 805 N.E.2d at 1194. The committee note to that instruction states that the court must also give an instruction defining the offense that is the alleged subject of the conspiracy. *Hopp*, 209 Ill. 2d at 7, 805 N.E.2d at 1194. In that case, the court found that it was mandatory that the trial court give an instruction defining first degree murder. *Hopp*, 209 Ill. 2d at 7, 805 N.E.2d at 1194. However, the court ultimately concluded that the court's error did not rise to the level of plain error. *Hopp*, 209 Ill. 2d at 18-19, 805 N.E.2d at 1200.

In this case, the committee note to IPI Criminal 4th No. 24—25.09X does not mandate that it be given whenever IPI Criminal 4th No. 24.25.09 is given. Rather, the note states that both instructions should be given in appropriate cases. The decision as to whether both instructions are appropriate given the specific alleged facts of a case is left to the trial court's discretion. See *People v. Sims*, 374 Ill. App. 3d 427, 431, 871 N.E.2d 153, 156-57 (2007). However, even if the trial court abused its discretion in this case by failing to *sua sponte* give IPI Criminal 4th No. 24—25.09X, any error did not rise to the level of plain error because, as discussed below, the determination of the identity of the initial aggressor was not an essential element in this case.

Furthermore, we disagree with the defendant's proposition that instructing the jury on an issue, but not as to the opposite scenario, directed the jury's finding on that issue or "ascribed [a] label to the defendant." The jury was not stripped of its role as fact finder by the failure to give both IPI Criminal 4th No. 24—25.09 and IPI Criminal 4th No. 24—25.09X. Looking at the jury instructions as a whole, the jury was clearly instructed of its duty to be the final arbiter of the facts, including the determination of whether the defendant was the initial aggressor. The jury in this instance was not misinformed of the applicable law, and was not stripped of its role as finder of fact.

In addition, a determination of whether the defendant initially provoked the use of force was not an essential element of the charged crime or his claim of self-defense. The jury was instructed on the elements and burdens of proof of first degree murder, second degree murder, and self-defense. Under the evidence presented in this case, the defendant's claim of self-defense hinged on the reasonableness of the defendant's use of force, not on whether he had a duty to escape before inflicting that force. Regardless of whether the jury believed that the defendant was the initial aggressor and provoked Polnitz into hitting him on the back of the head, the defendant testified that he responded by stabbing Polnitz three times. Thus, the critical question of the defendant's self-defense claim was whether his use of that force was reasonable in these circumstances. The omission of IPI Criminal 4th No. 24—25.09X did not create a risk that the jury misunderstood the applicable law in this case. Thus, the trial court's failure to *sua sponte* instruct the jury of IPI Criminal 4th No. 24—25.09X was not plain error.

■ Alternatively, the defendant contends that trial counsel was ineffective by failing to request IPI Criminal 4th No. 24—25.09X. To sustain a claim of ineffective assistance of counsel, a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness, and that this performance actually prejudiced the defendant. *People v. Johnson*, 218 Ill. 2d 125, 143, 842 N.E.2d 714, 725 (2005). To prove prejudice, the defendant must show that but for counsel's deficient performance, there was a reasonable probability that the trial result would have been different. *Johnson*, 218 Ill. 2d at 143-44, 842 N.E.2d at 725.

In this case, the defendant has not shown that he would have been found not guilty or that the jury would have found him guilty of the lesser offense of second degree murder if counsel had requested the subject jury instruction. As previously discussed, the question of whether the defendant was the initial aggressor was presented to the jury. Furthermore, a determination of this issue does not affect the jury's apparent conclusion that the defendant did not believe, reasonably or unreasonably, that his use of force was necessary to prevent imminent death or great bodily harm to himself. Thus, we find that defendant's claim of ineffective assistance of counsel fails.

Finally, the defendant claims that he was denied his right to a trial by an impartial jury because the jury *voir dire* was inadequate. The defendant maintains that the trial court's failure to strictly comply with Supreme Court Rule 431(b) was plain error and requires reversal of his conviction. Ill. S. Ct. R. 431 (eff. May 1, 2007). The State contends that the court's error was harmless.

■ Supreme Court Rule 431(b) was passed to ensure compliance with the supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984). *Zehr* held that it was reversible error where the trial court refused to ask questions proffered by the defendant concerning the presumption of innocence and the State's burden to prove the defendant guilty beyond a reasonable doubt, and the subject matter of those questions was not otherwise included during *voir dire*. *Zehr*, 103 Ill. 2d at 476-78, 469 N.E.2d at 1063-64. The rule was amended in 2007, deleting the phrase "If requested by the defendant," from the beginning of the paragraph. Effective May 1, 2007, Rule 431(b) provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431 (eff. May 1, 2007).

" 'The supreme court rules are not merely suggestions to be complied with if convenient but rather obligations which the parties and the courts are required to follow.' " *People v. Reed*, 376 Ill. App. 3d 121, 125, 875 N.E.2d 167, 171 (2007), quoting *Medow v. Flavin*, 336 Ill. App. 3d 20, 36, 782 N.E.2d 733, 746-47 (2002). We review *de novo* issues concerning the application of a supreme court rule. *Reed*, 376 Ill. App. 3d at 125, 875 N.E.2d at 171.

■ Here, the trial court informed the potential jurors during *voir dire* of the principles set forth in Rule 431(b), but did not specifically ask them if they understood and accepted these principles. This was error. However, the defendant did not object, request that the court ask the jurors whether they accepted the principles, or raise the issue in a posttrial motion and, thus, forfeited the issue for review. *People v. Allen*, 222 Ill. 2d 340, 350, 856 N.E.2d 349, 351 (2006). Therefore, we must determine whether the court's error constituted plain error. 134 Ill. 2d R. 615(a).

"The plain-error doctrine does not instruct a reviewing court to consider all forfeited errors." *People v. Herron*, 215 Ill. 2d 167, 177,

830 N.E.2d 467, 474 (2005). A reviewing court will reach a forfeited error affecting substantial rights in two circumstances. *Herron*, 215 Ill. 2d at 178, 830 N.E.2d at 475. First, the court may consider a forfeited error "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." *Herron*, 215 Ill. 2d at 178, 830 N.E.2d at 475. Second, a reviewing court may consider a forfeited error "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *Herron*, 215 Ill. 2d at 179, 830 N.E.2d at 475.

The defendant maintains that the court's error was so fundamental and of such magnitude that he was denied a fair trial. The defendant has the burden of persuading this court that the court's error severely threatened the fairness of his trial. *Herron*, 215 Ill. 2d at 187, 830 N.E.2d at 480, citing *Hopp*, 209 Ill. 2d at 12, 805 N.E.2d at 1197.

In *People v. Emerson*, 122 Ill. 2d 411, 425-27, 522 N.E.2d 1109, 1114-15 (1987), the supreme court considered whether the trial court erred by refusing to ask prospective jurors whether they understood that an accused is presumed to be innocent and whether they had any objection to that principle. While we are mindful that this case predates Supreme Court Rule 431(b), we find it helpful in our determination of whether the trial court's error here deprived the defendant of a fair trial. In *Emerson*, the trial court declined the defendant's request to ask potential jurors "whether they understood that an accused is presumed to be innocent and whether they had any objection to that principle" because the court believed it had sufficiently covered those principles in other remarks. *Emerson*, 122 Ill. 2d at 425, 522 N.E.2d at 1114. The trial court had instructed the prospective jurors on the *Zehr* principles and asked the jury panel whether they could follow the law as instructed by the court. *Emerson*, 122 Ill. 2d at 426, 522 N.E.2d at 1114. The supreme court concluded that the trial court's instructions coupled with this question satisfied *Zehr. Emerson*, 122 Ill. 2d at 427, 522 N.E.2d at 1115.

In this case, at the beginning of the *voir dire*, the trial court informed the jury pool of the four principles set forth in Rule 431(b). Additionally, the court questioned the potential jurors regarding the first of these principles, albeit in a slightly different form, when it asked "Do you have any bias against a person merely because he has been charged with a criminal offense?" The court also asked the jurors a series of questions regarding their ability to follow the court's instructions, decide the case fairly and without prejudice, and wait until the conclusion of all evidence to formulate an opinion. In light of these circumstances, we do not believe that the trial court's failure to strictly comply with Rule 431(b) denied the defendant an impartial

jury and, thus, a fair trial. See *Emerson*, 122 Ill. 2d at 426-27, 522 N.E.2d at 1114-15; see also *People v. Stump*, 385 Ill. App. 3d 515, 520-22, 896 N.E.2d 904, 908-09 (2008) (determining trial court's failure to strictly comply with Rule 431(b) did not require reversal and engaging in a harmless error analysis). Thus, we cannot find that the claimed error gave rise to the application of the plain error doctrine under either prong.

The defendant also argues that the court undermined the importance of the Rule 431(b) principles when it stated that these principles were fundamental principles, but not instructions of law, which the jury would receive at the end of the case. The court's comments seem to be taken from the language of Rule 431. Rule 431(b) calls the relevant principles "principles." In addition Rule 431(a) directs the court to "acquaint prospective jurors with the general duties and responsibilities of jurors," and cautions the court not to question jurors on matters of law or instructions. Ill. S. Ct. R. 431(a) (eff. May 1, 2007). We decline to find that the court's decision to use language from Rule 431 caused the jurors to believe that they need not concern themselves with the principles stated by the court.

We acknowledge that our conclusion conflicts with a recent decision by the First District Appellate Court. In *People v. Anderson*, 389 Ill. App. 3d 1 (2009), the court held that the trial court had committed plain error by failing to comply with Rule 431(b). In that case, the trial court informed the first panel of prospective jurors of only three of the four principles enumerated in Rule 431(b). In addition, the trial court failed to specifically ask these prospective jurors whether they understood and would comply with those principles. Instead, the trial court asked whether the jurors could find the defendant guilty if the State met its burden of proof, and, conversely, whether the jurors could find the defendant not guilty if the State failed to meet its burden. The court considered the language of the rule and found that language to impose a mandatory duty upon the trial courts to inform potential jurors of the rule's principles and ascertain whether those jurors understood and accepted those principles. The court concluded that the trial court's failure to strictly comply with the requirements of Rule 431(b) rendered the defendant's trial fundamentally unfair and, thus, reversed his conviction.

The instant case is factually distinguishable from *Anderson*. The trial court here instructed the potential jurors of all four of the Rule 431(b) principles. In addition, the trial court questioned the jurors concerning the presumption of innocence and their ability to be fair to both parties and otherwise follow the law as instructed by the court.

While we agree with the *Anderson* court that failing to comply with Rule 431(b) is error, the error made here did not deprive the defendant of an impartial jury and a fair trial. In addition, the plain error analysis is an analysis of the facts and circumstances of a particular case. We cannot hold that the failure to follow a supreme court rule standing alone becomes *per se* plain error. See *People v. Enis*, 163 Ill. 2d 367, 645 N.E.2d 856 (1994) (finding that violation of Supreme Court Rule 412, which requires the prosecution to disclose the names of all witnesses likely to be called to testify at trial, did not amount to plain error).

## CONCLUSION

Based upon the above analysis, we find that the trial court's failure to *sua sponte* instruct the jury under IPI Criminal 4th No. 24—25.09X was not plain error. In addition, trial counsel was not ineffective for failing to request that instruction. Finally, although the trial court erred by failing to question the prospective jurors about their acceptance of the principles set out in Rule 431(b), that failure did not render the defendant's trial fundamentally unfair. Accordingly, the judgment of the Peoria County circuit court is affirmed.

Affirmed.

SCHMIDT, J., concurs.

JUSTICE McDADE, concurring in part and dissenting in part:
I concur in that portion of the majority's decision finding that: (1) the trial court's failure to *sua sponte* instruct the jury of IPI Criminal 4th No. 24—25.09X was not plain error, and (2) defendant's claim of ineffective assistance of trial counsel fails on its merits. I dissent, however, from that portion of the majority's decision finding that trial court's failure to comply with Supreme Court Rule 431(b) (177 Ill. 2d R. 431(b)) does not entitle defendant to a new trial.

Defendant claims the trial court failed to comply with the mandates of Rule 431(b). The rule was amended effective May 1, 2007. The amendment imposed upon the trial court a duty to question the potential jurors during *voir dire* to ascertain their understanding and acceptance of the principles related to the basic constitutional guarantees of a criminal defendant during his trial. See 177 Ill. 2d R. 431(b).

The State concedes that the trial court failed to comply with Rule 431(b). Specifically, the State acknowledges that the court failed to "provide each juror an opportunity to respond to the specific ques-

tions of whether they understood and accepted the principles set out in the section." I, as did the majority, accept the State's concession and find that the court's failure to specifically comply with the rule was error. This finding, however, does not end our analysis. Instead, we must determine whether the error entitles defendant to a new trial.

The State claims that the error was harmless and thus does not warrant reversal. In support of this assertion, the State cites the Fourth District's holding in *People v. Stump*, 385 Ill. App. 3d 515, 896 N.E.2d 904 (2008). Upon review, the majority affirms defendant's conviction on the grounds that the error does not constitute reversible plain error. 391 Ill. App. 3d at 432. I address both the State's argument and the majority's finding in turn.

As did defendant here, the defendant in *Stump* also claimed that the trial court erred in failing to question the jurors during *voir dire* in compliance with Rule 431(b). While the State conceded error, it argued that the error was harmless given the weight of evidence against defendant and the fact that the trial court sufficiently complied with the gist of Rule of 431(b). On appeal, the court agreed that the error was harmless because all four of the principles announced in Rule 431(b) were addressed to each juror at some point during *voir dire* and the evidence against the defendant was overwhelming. *Stump*, 385 Ill. App. 3d at 522, 896 N.E.2d at 909. The court cited our supreme court's holding in *People v. Houston*, 226 Ill. 2d 135, 874 N.E.2d 23 (2007), as authority to employ a harmless-error analysis rather than mandating strict compliance with Rule 431(b). *Stump*, 385 Ill. App. 3d at 520, 896 N.E.2d at 908. Specifically, the court stated:

> "Given the mandatory nature of *** [R]ule [431(b),] it would appear that we are required to reverse defendant's conviction regardless of whether the court's failure to question the jurors as required by Rule 431(b) resulted in prejudice to defendant.

> However, we find guidance in our supreme court's decision in *People v. Houston*, 226 Ill. 2d 135, 874 N.E.2d 23, where the court failed to give *full* effect to the principle of strict compliance with the mandatory nature of the Illinois Supreme Court rules. In *Houston*, the defendant claimed that his trial counsel was ineffective for waiving a court reporter during *voir dire*. The supreme court found that counsel's waiver constituted deficient performance because it violated Supreme Court Rule 608(a)(9) [citation], a rule that provides that *voir dire* 'shall' be recorded. [Citation.] Although the court specifically noted that the supreme court rules must be obeyed and enforced, it remanded the case with directions to conduct a hearing to reconstruct the *voir dire* record so that the defendant's claim of prejudice could be further examined. [Cita-

tion.] The court did *not* find that the failure to comply with Rule 608(a)(9) resulted in automatic reversal; but rather, the court held that the prejudice prong of *Strickland* analysis [citation] needed to be further examined.

Similar to a *Strickland* analysis, prejudice is inherent in a harmless-error analysis. [Citation.] Because the court in *Houston* sought to have the prejudice to the defendant further examined before reversing on the basis of ineffective-assistance-of-counsel claim, this court will likewise engage in a harmless-error analysis and search the record for a demonstration that defendant was prejudiced by the trial court's failure to comply with Rule 431(b)." (Emphasis in original.) *Stump*, 385 Ill. App. 3d at 520-21, 896 N.E.2d at 908.

Upon review, I would reject the *Stump* court's reasoning. Instead, I believe that the trial court's error in failing to require each juror to demonstrate in response to questions asked by the court that he or she fully understood and accepted the bedrock principles integral to a fair trial, which are set out in Rule 431(b), mandates reversal of a new trial. I base this finding on two factors. The first basis is that our supreme court has expressly stated on numerous occasions that its rules " ' "are not aspirational. They are not suggestions. They have the force of law, and the presumption must be that they will be obeyed and enforced as written." ' " *Rodriguez v. Sheriff's Merit Comm'n*, 218 Ill. 2d 342, 353, 843 N.E.2d 379, 385 (2006), quoting *Roth v. Illinois Farmers Insurance* Co., 202 Ill. 2d 490, 494, 782 N.E.2d 212, 215 (2002), quoting *Bright v. Dicke*, 166 Ill. 2d 204, 210, 652 N.E.2d 275, 277-78 (1995). The *Stump* court's ruling fails to give effect to this proscription and instead inappropriately expands the *Houston* court's limited holding. While the *Houston* court ultimately held that the failure to obtain the presence of a court reporter during *voir dire* does not create, in itself, a *per se* presumption of ineffective assistance of counsel, it "emphasize[d] the limited scope of [its] decision." *Houston*, 226 Ill. 2d at 152, 874 N.E.2d at 34. Specifically, the court stated:

"We hold that where, as in the unusual case before us, a defendant attempts to raise in the trial court a *Batson* claim of discrimination in jury selection, and the claim may not be pursued because trial counsel waived the presence of the court reporter for *voir dire*, in violation of our Rule 608(a)(9), resulting in the absence of a *voir dire* record, the appropriate course, in the first instance, is to remand to the circuit court for an attempt to reconstruct the record of the proceedings regarding the selection of the jury." *Houston*, 226 Ill. 2d at 152-53, 874 N.E.2d at 34.

The above language illustrates the limited scope of the *Houston* court's holding. Thus, I view *Houston* merely as an exception to the

general rule that supreme court rules must be enforced as written. In doing so, I reject the *Stump* court's decision to engage in a harmless-error analysis to determine whether defendant was prejudiced by the trial court's failure to comply with Rule 431(b). Just as the supreme court has the authority to draft the rules which bind us, it also holds the authority to enact exceptions to those rules. We, at the appellate level, are not endowed with such authority. Instead, we are bound to follow the supreme court precedent, which requires strict compliance and enforcement of supreme court rules as written. See *Rodriguez v. Sheriff's Merit Comm'n*, 218 Ill. 2d 342, 353, 843 N.E.2d 379, 385 (2006); *Roth v. Illinois Farmers Insurance* Co., 202 Ill. 2d 490, 494, 782 N.E.2d 212, 215 (2002); *Bright v. Dicke*, 166 Ill. 2d 204, 210, 652 N.E.2d 275, 277-78 (1995). If the supreme court wishes to make an exception to this general rule for Rule 431(b) violations, as it did in *Houston* for Rule 608(a)(9) violations, it may absolutely do so. However, until it does, we are not at liberty to excuse such violations. In order to give full effect to Rule 431(b) as written, we must reverse defendant's conviction and remand the matter for a new trial. Only through a new trial will defendant be afforded the protections Rule 431(b) sets out to provide.

I believe my position is actually supported by the supreme court's express caution in *Houston*. Even in choosing not to give *full* effect to the principle of strict compliance with the mandatory nature of the Illinois Supreme Court rules, the *Houston* court took the time to limit its decision to the particular facts before it. Specifically, the court stated:

> "We emphasize the limited scope of our decision. We do not conclude that the failure to obtain the presence of a court reporter during *voir dire* creates, in itself, a *per se* presumption of ineffective assistance of counsel. [Citation.] Nor do we conclude that the mere failure to record *voir dire*, without any claim of error in the jury selection process, requires a remand for reconstruction of the jury selection proceedings. [Citation.] This is not to say, however, that our rules are unimportant. We point out that the difficulty presented in the case at bar could have been avoided had the trial judge simply followed the mandate of Rule 608(a)(9). This court has often noted that our rules are not mere suggestions. Rather, '[t]hey have the force of law, and the presumption must be that they will be obeyed and enforced as written.' [Citation.] The situation here confronting us illustrates the importance of our rules and the need for compliance with them." *Houston*, 226 Ill. 2d at 152, 874 N.E.2d at 34.

Clearly, the *Houston* court did not overrule the principle of strict compliance with the mandatory nature of the Illinois Supreme Court

rules. In fact, the court reaffirmed the presumption that its rules will be obeyed and enforced as written. See *Houston*, 226 Ill. 2d at 152, 874 N.E.2d at 34. Thus, until our supreme court makes an exception to this general rule for Rule 431(b) violations, we are not at liberty to excuse such violations.

The second basis for believing defendant's conviction must be reversed and the matter remanded for a new trial is that, contrary to the majority's conclusion, I would find that the error *does* constitute reversible plain error. In support of its finding, the majority cites *People v. Emerson*, 122 Ill. 2d 411, 522 N.E.2d 1109 (1987). The holding in *Emerson*, however, is not relevant to the disposition of the instant appeal in light of the fact it predates Rule 431(b). Instead, I believe we should adopt the First District's reasoning in *People v. Anderson*, 389 Ill. App. 3d 1 (2009). While the defendant in *Anderson* failed to make a Rule 431(b) objection at trial, the appellate court found plain error where the trial court failed to inform the prospective jurors of all the principles enumerated in Rule 431(b) and failed to inquire whether the jurors understood and would comply with those principles it did discuss. *Anderson*, 389 Ill. App. 3d at 9-10. After discussing the general rule that supreme court rules must be enforced as written, the court stated:

"Before the 2007 amendment, the court was required to admonish the jurors and ascertain whether they understood and accepted the enumerated principles announced in *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984), '[i]f requested by the defendant.' [Citation.] Before that, in 1997, Rule 431 was amended to ensure compliance with the *Zehr* principles by changing the court's *voir dire* requirements from discretionary to compulsory by amending the word 'may' to 'shall.' [Citation.]

It is axiomatic that amendments to rules are designed to serve some purpose. [Citation.] We must construe the rule consistent with the purpose of the amendments, relying on the presumption that the supreme court intended to change the law in 1997 and 2007. [Citation.]

The clear language of Rule 431(b) requires the court to ensure jurors are qualified to know, understand, and accept the enumerated principles and are provided with an opportunity to respond. [Citation.] The rule 'seeks to end the practice where the judge makes a broad statement of applicable law followed by a general question concerning the juror's willingness to follow the law.' [Citation.]

When the 2007 amendment deleted the language '[i]f requested by the defendant,' the rule charged trial courts with an affirmative *sua sponte* duty to ask potential jurors whether they understand

and accept the *Zehr* principles in each and every case. [Citation.] Moreover, the court must provide each juror with 'an opportunity to respond to' the specific *Zehr* principles. We find Rule 431(b) was amended to send a clear message to trial and appellate courts: it is the courts' responsibility to enforce the rules as written. Compliance with Rule 431(b) is a judicial duty.

\* \* \*

We recognize the evidence against the defendant was substantial. But the weight of the evidence is not something we are obliged to consider. We have found the plain error described in the second circumstance of the *Herron* test. That is, the Rule 431(b) error 'is so serious that defendant was denied a substantial right, and thus a fair trial.' [Citation.] Once having said that, there is no need to inquire into the harmfulness of the error or the measure of prejudice incurred by the defendant. Plain error is reversible error. [Citation.] There is no need for further inquiry." *Anderson*, 389 Ill. App. 3d at 7-9.

In adopting the *Anderson* court's reasoning, I reject the majority's finding that *Anderson* is distinguishable on the ground that the trial court here informed the potential jurors of all four Rule 431(b) principles. The majority's reasoning misses the point. A criminal defendant is constitutionally entitled to a fair trial by an impartial jury, as a matter of due process. *Turner v. Louisiana*, 379 U.S. 466, 471, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546, 549 (1965). Rule 431(b) helps ensure that this fundamental due process principle is carried out. In amending Rule 431(b), our supreme court has told us that merely informing the jurors of the four Rule 431(b) principles is insufficient to ensure defendant of a fair trial. Instead, the current amended version of Rule 431(b) requires trial courts to ensure that the jurors actually know, understand, and accept the enumerated principles by requiring them to demonstrate their knowledge and acceptance by response to direct questions. 177 Ill. 2d R. 431(b). Thus, I believe a trial court's failure to comply with Rule 431(b) as a whole not only violates the general supreme court mandate requiring strict compliance and enforcement of supreme court rules as written, but also constitutes plain error.

Although it is not necessary to my analysis, I would like to address the majority's conclusion that the failure to comply with Rule 431(b) was "harmless." How could they possibly know that? Counsel for the parties and trial judges are frequently astounded by jury verdicts. It is impossible to predict what facts or assumptions tip the scales for the jurors one way or the other. The only thing we can know with certainty is how *we* would have decided the case. When we do our review, pursu-

ant to our standard of review, the defendant has lost the presumption of innocence—a presumption which the jurors are required to maintain until their verdict divests him of its protection. How can we possibly know how *they* would view the evidence if they had truly internalized that obligation? Nor can we do more than speculate about the impact of a juror's sure understanding that it is the State's burden to prove defendant guilty beyond a reasonable doubt and exactly what that standard means. The same is true concerning the defendant's lack of any burden of proof. Finally, defendant's election not to testify could have been completely dispositive of his guilt if the jurors did not *know* that they could not hold that choice against him. Absent adherence to Rule 431(b), we can have no confidence that jurors knew not only of the existence of these principles but also of their sworn obligation to understand and follow them.

For the foregoing reasons, I would reverse defendant's conviction and remand for a new trial.