No. 3–07–0915
Opinion filed March 29, 2011

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2011

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court for the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | No. 07–CF–697 |
| v. | ) ) | |
| DAVID ALEXANDER, | ) ) | Honorable Stuart P. Borden, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Justice McDade specially concurred, with opinion.

**OPINION**

Following a jury trial, the defendant, David Alexander, was convicted of first degree murder (720 ILCS 5/9–1(a)(2) (West 2006)) for the stabbing death of Sylvester "Mike" Polnitz. The defendant claimed the stabbing was self-defense. Alternatively, the defendant presented a second-degree-murder theory based upon an unreasonable belief in the justified use of force. The jury rejected both theories and found the defendant guilty of first degree murder. On appeal, the defendant claims: (1) the trial court erred by failing to *sua sponte* give Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (4th ed. 2000) (hereinafter, IPI Criminal 4th); (2) trial counsel

was ineffective by failing to request IPI Criminal 4th No. 24-25.09X; and (3) he was denied a fair trial because the trial court did not strictly comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). We affirmed the judgment of the trial court on May 13, 2009. *People v. Alexander*, 391 Ill. Ap. 3d 419 (2009). On September 30, 2009, the Illinois Supreme Court entered a supervisory order directing this court to vacate its judgment in this matter and reconsider its judgment in light of *People v. Glasper*, 234 Ill. 2d 173 (2009), to determine if a different result was warranted. *People v. Alexander*, 233 Ill. 2d 565 (2009). After reconsidering the matter, we again affirmed. *People v. Alexander*, 396 Ill. App. 3d 563 (2009). On January 26, 2011, the Illinois Supreme Court entered a supervisory order directing this court to vacate its judgment in this matter and reconsider its judgment in light of *People v. Thompson*, 238 Ill. 2d 598 (2010), to determine if a different result is warranted. *People v. Alexander*, No. 109683 (Jan. 26, 2011). We have reconsidered the matter based upon on *Thompson* and we again affirm the trial court's judgment.

FACTS

The defendant's trial began on October 1, 2007, with the selection of the jury. At the beginning of the jury *voir dire*, the trial court stated:

> "I shall now at this time touch upon broad fundamental principles that are applicable to criminal cases. Do not consider these to be instructions of law. Those will be given to you later at the conclusion of the case. Now, the indictment that I just read to you or the charge against the defendant is not any evidence or presumption of guilt against the defendant. It's merely a formal charge necessary to place him on trial. The defendant is presumed to be innocent of the charge in the indictment. This presumption remains with him throughout the trial until you've been satisfied by the

evidence beyond a reasonable doubt as to the guilt of the defendant, and the burden of proving the guilt of the defendant beyond a reasonable doubt is on the State. The law does not require the defendant to prove his innocence. The defendant is not required to present any evidence or testify, and if he chooses not to testify in this case, it cannot be held against him."

At that time, the court did not ask the potential jurors, individually or in a group, whether they understood and accepted those principles. The defendant did not object or request that the court question the potential jurors on those principles.

The court then proceeded to question each potential juror individually. During this questioning, the court asked the first juror the following questions:

"Do you have any bias against a person merely because he has been charged with a criminal offense? *** Will you follow the court's instructions regarding the law regardless of your own personal opinion? *** Will you decide the case without sympathy and prejudice? *** Will you give both the State and the defendant a fair trial? *** Can you wait until the entire case is over and you are actually back in the jury room deliberating before you begin to form your final opinion?"

The court asked substantially the same questions of each subsequent potential juror.

After the jury had been empaneled, the State presented its evidence. Trina Owens testified that she was present at the apartment of the defendant and his girlfriend Kim on the evening of June 22, 2007. When Owens arrived at the apartment, the defendant was not home. Owens and Kim drank an alcoholic beverage and talked for a few hours. Owens testified that she became intoxicated. When the defendant arrived home, he and Kim had a conversation. After that conversation, the

3

defendant asked Owens whether she knew anything about Polnitz shoving and attempting to rape Kim. Owens told him, "No." Owens testified that the defendant seemed calm after this conversation.

Approximately 20 to 30 minutes later, the defendant left the apartment. Owens testified that before the defendant left the apartment, he was in the kitchen and was upset. After the defendant left, Owens looked out the front door to see what the defendant was doing. Owens saw the defendant standing near the front door of Polnitz's apartment. Owens went back inside the apartment to speak to Kim. Owens then went back outside and saw the defendant standing there looking upset. She then went back inside to speak to Kim again, trying to convince her to go and speak to the defendant. Owens then went back out the front door of the apartment onto the front porch. Owens testified that she then saw Polnitz and the defendant toward the back of the building. Owens testified that she felt panicky and went back into the apartment. She then went back outside and saw Polnitz and the defendant running toward an alley. Owens went back in the apartment to convince Kim to speak to the defendant, but Kim did not go outside. Owens went back outside and walked toward the alley. Owens testified that when she reached the alley, she saw Polnitz bleeding and holding his side, and the defendant holding a knife. Owens told the defendant to stop and put down the knife. She then ran to a neighbor's house and asked someone to call 911. Owens then returned to the alley and saw the defendant, Polnitz, and a woman. Polnitz was on the ground and bleeding. Owens testified that she saw a lot of blood. Owens told them that she had called for help, and the defendant left soon thereafter.

Officer Brad Venzon testified that he was dispatched to an alley shortly after midnight on June 23, 2007. Venzon was the first responder to the scene. Venzon observed a woman kneeling over a man who was lying on his back in the alley. The man's left leg was covered in blood and there was

4

a large amount of blood on the ground under his leg. Venzon approached the people in the alley. The man was barely conscious, and he was gasping for air. The woman told the officer that the man's name was Sylvester Polnitz and that he had been stabbed in the leg. The woman also told Venzon the name of the person who had stabbed Polnitz. Venzon applied pressure to Polnitz's leg in an attempt to stem the bleeding. A few minutes later, emergency medical personnel arrived. After securing the alley, Venzon walked back toward the apartment building. Venzon did not find any weapons or see any blood on the ground on the way.

Captain Tom Carr of the Peoria fire department testified that he responded to a report of a stabbing in an alley shortly after midnight on June 23, 2007. Carr arrived at the alley approximately two to three minutes after the initial report. Upon arrival, Carr observed Polnitz lying on the ground and bleeding heavily from a wound to his lower leg. Carr testified that Polnitz was also in respiratory distress when he arrived at the scene. Paramedics arrived approximately two to three minutes after Carr. Polnitz went into full arrest while still in the alley. The emergency medical personnel, including Carr, transported Polnitz to Saint Francis hospital while attempting cardiopulmonary resuscitation.

Officer Roberto Vasquez of the Peoria police department testified that he was assigned to follow the ambulance and stay with Polnitz at the hospital on June 23, 2007. Vasquez was present when Polnitz was pronounced dead at approximately 12:53 a.m.

Emily Foster testified that she lived in an apartment with her children, her aunt and Polnitz, who was her aunt's boyfriend. There were three apartments in the building–two apartments on the ground floor, and one upstairs. Emily lived in one of the ground-floor apartments, and the defendant lived in the other.

On Friday night, June 22, 2007, Emily and Polnitz walked from their apartment to a gas

5

station to buy cigarettes. Emily testified that it was raining that night. When they returned home, they entered the back porch to go into their apartment. As they entered the porch, Emily heard someone banging on the front door. Emily stayed on the back porch while Polnitz walked around the building toward the front door. Emily then heard Polnitz yelling. Emily stepped off the back porch and saw Polnitz running toward the alley with the defendant following him. Emily testified that she did not see any blood on Polnitz at that time, nor was Polnitz limping. Emily ran after them into the alley. When Emily arrived at the alley, she saw Polnitz on his hands and knees crawling away from the defendant. Emily testified that she then saw the defendant stab Polnitz in his lower left leg. Emily yelled at the defendant, who turned and began yelling back at her. Polnitz told the defendant to leave her alone. The defendant turned back toward Polnitz and then ran back toward the apartment building. Emily ran to Polnitz. Polnitz stood up, walked a few feet and told her to call 911 before lying back down. Emily then called 911.

Detective Mark Lamb testified that he arrived at the scene of the stabbing at approximately 1 a.m. Lamb observed a large pool of blood in the alley. Lamb walked from the alley to the apartment building. He testified that he did not find a blood trail between the alley and the building. Lamb testified that a porch runs along the front of the building onto which the front doors of the apartments open. There were two small tables and two chairs on the front porch of the building near the front door of the defendant's apartment. Lamb did not see any tables near the front door of Polnitz's apartment. Lamb also testified that there was a rug on the porch and that there were numerous stains on the rug.

Officer Scott Bowers arrived to investigate the scene of the stabbing at approximately 2:15 a.m. on June 23, 2007. Bowers testified that it was raining that morning. Bowers searched the alley

6

and the area between the alley and the apartment building. Bowers did not find a weapon or any signs of blood outside of the alley. He also did not find a weapon or any blood on the front porch of the building.

Dr. Violette Hnilica, a forensic pathologist, testified that she performed an autopsy on Polnitz on June 23, 2007. Hnilica testified that the cause of Polnitz's death was multiple stab wounds. Polnitz had multiple minor abrasions on the left side of his body. Polnitz also had three separate stab wounds; he had been stabbed once in the abdomen and twice in his lower left leg. One of the wounds in Polnitz's leg totally severed an artery and vein. Hnilica testified that this wound was the most rapidly fatal because it caused massive bleeding as blood was pushed out of the artery with every beat of Polnitz's heart. The other stab wound to the leg did not go as far into the leg and did not bleed as forcefully. Polnitz was also stabbed in his abdomen. That wound was three inches deep, but went into fat in the abdomen and did not cause serious damage.

In his defense, the defendant presented the testimony of Edward Barry. Barry testified that he has lived in the same neighborhood as the defendant since the defendant was born. Barry also testified that the defendant has a reputation as a peaceful and nonviolent person.

The defendant testified that he arrived home at approximately 10 or 10:30 p.m. on June 22, 2007. The defendant's girlfriend, Kim, was crying and appeared upset. Kim eventually told the defendant that earlier that day Polnitz had knocked on the door of their apartment and then pushed the door in and attempted to sexually assault her. The defendant testified that Kim told him this information in pieces and was evasive. The defendant decided to go next door and speak to Polnitz. The defendant testified that he went outside onto the porch and then knocked on the front door of Polnitz's apartment. Polnitz's girlfriend told the defendant that Polnitz was not home, so the

7

defendant went back into his apartment.

Approximately 30 to 45 minutes later, the defendant knocked on Polnitz's front door again. The defendant testified that he did not have anything in his hands at this time and that it was raining. The defendant knocked on Polnitz's door, which was not on the covered porch, and then stepped back onto the porch to get out of the rain. Polnitz then came around the outside of the house from the rear and walked onto the covered porch. The defendant testified that he greeted Polnitz and then asked him what happened between Polnitz and Kim. Polnitz became angry and began yelling at the defendant. The defendant turned to go back into his apartment. Polnitz said, "You ain't nothing but a little punk anyway," and hit the defendant on the back of his head. The defendant fell, and his hand hit a small table on the porch as he tried to catch himself. The defendant testified that there was a tire jack and a knife on the table. The defendant picked up the knife and turned toward Polnitz. As Polnitz advanced toward him, the defendant stabbed him in the abdomen. The defendant testified that he stabbed Polnitz because Polnitz was yelling at him and continuing to come toward him. The defendant thought that Polnitz was going to hit him again. After the defendant stabbed Polnitz, Polnitz continued to advance toward him, so the defendant stabbed him twice in the leg. The defendant was still on the floor of the porch when he stabbed Polnitz, who was standing over him. The defendant testified that he could not escape from Polnitz because there was a porch railing on one side of him and the wall of the building on the other.

After the defendant stabbed Polnitz the third time, Polnitz ran toward the alley. The defendant testified that he then threw down the knife and followed Polnitz. When the defendant was approximately 15 feet away from Polnitz, he saw Polnitz trip and fall in the middle of the alley. At that point, Emily walked up behind the defendant and asked him what he was doing. The defendant

8

told her "nothing" and walked back toward his apartment. At that time, the defendant did not think that he had badly hurt Polnitz. The defendant testified that he did not go back inside the apartment because he did not want Polnitz to "mess with" Kim or her daughter. Instead, the defendant got on a bus and eventually went to his sister's house. The defendant further testified that when he learned that Polnitz had died from the stab wounds, he turned himself in to the police.

In rebuttal, the State presented additional testimony from Detective Lamb. Lamb testified that he interviewed the defendant on June 24, 2007, which was video-recorded. The State played three small sections of the interview for the jury, totaling 10 seconds in duration.

The jury was also presented with evidence regarding the previous criminal convictions of both Polnitz and the defendant. Polnitz had been convicted of domestic battery in 2001 and disorderly conduct in 2003. The defendant was convicted twice of misdemeanor theft in 2003.

During the jury instruction conference, the State requested IPI Criminal 4th No. 24-25.09, and the defendant objected. This instruction provides:

> "A person who initially provokes the use of force against himself is justified in the use of force only if
>
> the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." IPI Criminal 4th No. 24-25.09.

The court ruled that sufficient evidence had been introduced to suggest that the defendant had initially provoked the use of force and allowed the instruction. Neither party requested IPI Criminal 4th No. 24-25.09X, which states, "A person who has not initially provoked the use of force against himself

9

has no duty to attempt to escape the danger before using force against the aggressor."

The jury found the defendant guilty of first degree murder, and the defendant was sentenced to 35 years' imprisonment. The defendant appeals.

## ANALYSIS

On appeal, the defendant first contends that trial court erred by failing to *sua sponte* give IPI Criminal 4th No. 24-25.09X, regarding a defendant's use of force when the defendant was not the initial aggressor. The defendant claims that the jury's determination of whether he was the initial aggressor was an essential element of the offense and that it was the State's duty to prove beyond a reasonable doubt that the defendant was not justified in the use of force. The defendant further maintains that the trial court effectively instructed the jury that the defendant was in fact the initial aggressor by instructing it under IPI Criminal 4th No. 24-25.09, when a defendant is the initial aggressor, but by failing to *sua sponte* instruct it under IPI Criminal 4th No. 24-25.09X, when a defendant is not the initial aggressor. The defendant acknowledges that he did not request this instruction below, but he claims the issue should be considered as plain error under Illinois Supreme Court Rule 451(c) (eff. July 1, 2006) because the failure to instruct the jury under IPI Criminal 4th No. 24-25.09X threatened the fundamental fairness of the trial. The State disagrees, arguing that the trial court's failure to give IPI Criminal 4th No. 24-25.09X did not constitute plain error under Rule 451(c). The State contends that a determination of who was the initial aggressor in this case was not an essential element of the charged offense or of the defendant's self-defense claim.

It is the parties' responsibility to prepare jury instructions and tender those instructions to the trial court. *People v. Underwood*, 72 Ill. 2d 124, 129 (1978). "Generally, the trial court is under no obligation either to give jury instructions not requested by counsel or to rewrite instructions tendered

10

by counsel." *Underwood*, 72 Ill. 2d at 129.  In addition, a party may not raise on appeal the failure to give a jury instruction unless that party tendered the instruction.  Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb. 1, 1994).  However, substantial defects in jury instructions are not waived for failure to make a timely objection if the interests of justice require.  Ill. S. Ct. R. 451(c) (eff. July 1, 2006).  "Rule 451(c)'s exception to the waiver rule for substantial defects applies when there is a grave error or when the case is so factually close that fundamental fairness requires that the jury be properly instructed."  *People v. Hopp*, 209 Ill. 2d 1, 7 (2004).  "[T]he erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial."  *Hopp*, 209 Ill. 2d at 8.

To support his claim that the trial court erred by failing to give IPI Criminal 4th No. 24-25.09X, the defendant relies upon the committee note to the instruction.  That committee note states that in appropriate circumstances both IPI Criminal 4th No. 24-25.09 and IPI Criminal 4th No. 24-25.09X should be given.  IPI Criminal 4th No. 24-25.09X, Committee Note.

In *People v. Hopp*, the Illinois Supreme Court found that the court erred when it failed to give a pattern jury instruction defining first degree murder where the defendant was charged with conspiracy to commit first degree murder.  *Hopp*, 209 Ill. 2d at 7.  In that case, the jury was instructed under IPI Criminal 4th No. 6.03 of the elements of the crime of conspiracy.  *Hopp*, 209 Ill. 2d at 7.  The committee note to that instruction stated that the trial court was also to give an instruction defining the offense that was the alleged subject of the conspiracy.  *Hopp*, 209 Ill. 2d at 7.  Upon review, the supreme court found that it was mandatory for the trial court to give an instruction that defined first degree murder.  *Hopp*, 209 Ill. 2d at 7.  However, the supreme court

11

ultimately concluded that the trial court's error did not rise to the level of plain error because the evidence was overwhelming and the error did not severely threaten the fairness of the defendant's trial. *Hopp*, 209 Ill. 2d at 18-19.

In this case, the committee note to IPI Criminal 4th No. 24-25.09X does not mandate that it be given whenever IPI Criminal 4th No. 24-25.09 is given. Rather, the note states that both instructions should be given in appropriate cases. The decision as to whether both instructions are appropriate, given the specific alleged facts of a case, is left to the trial court's discretion. See *People v. Sims*, 374 Ill. App. 3d 427, 431 (2007). Under the circumstances of this case, we find no abuse of discretion in the court's failure to *sua sponte* give the jury instruction at issue.

However, even if we were to find that the trial court abused its discretion by failing to *sua sponte* give IPI Criminal 4th No. 24-25.09X, any error that occurred did not threaten the fundamental fairness of the trial. The defendant argues that he was denied a fair trial because the jury instructions directed the jury's finding as to an essential element of the case. However, a determination of whether the defendant initially provoked the use of force was not an essential element of the charged crime or his claim of self-defense. The jury was instructed on the elements and burdens of proof of first degree murder, second degree murder, and self-defense. Under the evidence presented in this case, the defendant's claim of self-defense hinged on the reasonableness of the defendant's use of force, not on whether he had a duty to escape before inflicting that force. Regardless of whether the jury believed that the defendant was the initial aggressor and provoked Polnitz into hitting him on the back of the head, the defendant testified that he responded by stabbing Polnitz three times. The critical question of the defendant's self-defense claim was whether his use of that force was reasonable in these circumstances. Thus, the trial court's failure to *sua sponte* instruct the jury under

12

IPI Criminal 4th No. 24-25.09X did not direct the jury's finding as to an essential element in this case and did not create a risk that the jury misunderstood the applicable law.

Furthermore, we disagree with the defendant's proposition that instructing the jury on an issue, but not as to the opposite scenario, directed the jury's finding on that issue or "ascribed [a] label to the defendant." The jury was not stripped of its role as fact finder by the failure to give both IPI Criminal 4th No. 24-25.09 and IPI Criminal 4th No. 24-25.09X. Looking at the jury instructions as a whole, the jury was clearly instructed of its duty to be the final arbiter of the facts, including the determination of whether the defendant was the initial aggressor. The jury in this instance was not misinformed of the applicable law and was not stripped of its role as finder of fact. Thus, the defendant's forfeiture of this issue cannot be excused under Rule 451(c).

Alternatively, the defendant contends that trial counsel was ineffective by failing to request IPI Criminal 4th No. 24-25.09X. To sustain a claim of ineffective assistance of counsel, a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness, and that this performance actually prejudiced the defendant. *People v. Johnson*, 218 Ill. 2d 125, 143 (2005). To prove prejudice, the defendant must show that, but for counsel's deficient performance, there was a reasonable probability that the trial result would have been different. *Johnson*, 218 Ill. 2d at 143-44.

In this case, the defendant has not shown that he would have been found not guilty or that the jury would have found him guilty of the lesser offense of second degree murder if counsel had requested the subject jury instruction. As previously discussed, the question of whether the defendant was the initial aggressor was presented to the jury. Furthermore, a determination of this issue does not affect the jury's apparent conclusion that the defendant did not believe, reasonably or

13

unreasonably, that his use of force was necessary to prevent imminent death or great bodily harm to himself. Thus, we find that defendant's claim of ineffective assistance of counsel fails.

Finally, the defendant claims that he was denied his right to a trial by an impartial jury because the jury *voir dire* was inadequate. The defendant maintains that the trial court's failure to strictly comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) was plain error and requires reversal of his conviction. The State contends that the trial court's error was harmless.

Supreme Court Rule 431(b) was passed to ensure compliance with the supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472 (1984). *Zehr* held that it was reversible error where the trial court refused to ask questions proffered by the defendant concerning the presumption of innocence and the State's burden to prove the defendant guilty beyond a reasonable doubt, and the subject matter of those questions was not otherwise included during *voir dire*. *Zehr*, 103 Ill. 2d at 476-78. Initially, the rule provided that the court shall ask potential jurors whether they understand and accept certain principles if the defendant requests that the court do so. The rule was amended in 2007, deleting the phrase "If requested by the defendant," from the beginning of the paragraph.

Effective May 1, 2007, Rule 431(b) provides:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify

14

when the defendant objects.

> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

Under the current Rule 431(b), a specific question and response process is mandated. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The trial court is required to ask each potential juror whether he or she understands and accepts each of the principles set forth in Rule 431(b). *Thompson*, 238 Ill. 2d at 607. "The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607. We review *de novo* issues concerning the application of a supreme court rule. *People v. Reed*, 376 Ill. App. 3d 121, 125 (2007).

Here, the trial court informed the potential jurors during *voir dire* of the principles set forth in Rule 431(b), but did not specifically ask them if they understood and accepted those principles. However, the defendant did not object, request that the trial court ask the jurors whether they accepted the principles, or raise the issue in a posttrial motion and, thus, forfeited the issue for review. *People v. Allen*, 222 Ill. 2d 340, 350 (2006). Therefore, we must determine whether the defendant's forfeiture of the issue may be excused under the plain error rule (Ill. S. Ct. R. 615(a) (eff. Aug. 27, 1999)).

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Aug. 27, 1999). "The plain-error doctrine does not instruct a reviewing court to consider all forfeited errors." *People v. Herron*, 215 Ill. 2d 167, 177 (2005). A reviewing court will reach a forfeited error affecting substantial rights

in two circumstances. *Herron*, 215 Ill. 2d at 178. First, the court may consider a forfeited error "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." *Herron*, 215 Ill. 2d at 178. Second, a reviewing court may consider a forfeited error "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *Herron*, 215 Ill. 2d at 179.

The first step in any plain error analysis is to determine whether clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). " 'The supreme court rules are not merely suggestions to be complied with if convenient but rather obligations which the parties and the courts are required to follow.' " *Reed*, 376 Ill. App. 3d at 125 (quoting *Medow v. Flavin*, 336 Ill. App. 3d 20, 36 (2002)). In this case, the court admonished the jury venire of the Rule 431(b) principles, but did not specifically ask the potential jurors, either individually or in a group, whether they understood and accepted those principles, as required by the rule. Thus, the trial court erred. See Ill. S. Ct. R. 431(b) (eff. May 1, 2007); *Thompson*, 238 Ill. 2d at 607.

The defendant does not argue that the evidence was closely balanced. Thus, we limit our plain error analysis to the second prong of the *Herron* test. See *Herron*, 215 Ill. 2d at 179. The defendant maintains that the trial court's error was so fundamental and of such magnitude that he was denied a fair trial. The defendant has the burden of persuading this court that the trial court's error severely threatened the fairness of his trial. *Herron*, 215 Ill. 2d at 187 (citing *Hopp*, 209 Ill. 2d at 12).

In *Glasper*, the Illinois Supreme Court considered whether the trial court's failure to comply with the then-applicable version of Rule 431(b)(4) required automatic reversal or whether the error was amenable to harmless error review. See *Glasper*, 234 Ill. 2d at 194. The defendant in that case argued that the trial court's failure to ask the requested question under Rule 431(b)(4) deprived him

16

of his constitutional right to a fair trial before an impartial jury. *Glasper*, 234 Ill. 2d at 196. The supreme court ruled that the trial court's failure to comply with the previous version of Rule 431(b)(4) was not a structural error and, thus, automatic reversal was not required. *Glasper*, 234 Ill. 2d at 198. In doing so, the supreme court noted that a structural error was a systemic error that eroded the integrity of the judicial process and undermined the fairness of the proceedings. *Glasper*, 234 Ill. 2d at 197-98. When defining "structural errror," the supreme court quoted language in *Herron* that described the substantial rights prong of the plain error test. *Glasper*, 234 Ill. 2d at 197-98. Thus, we conclude that the discussion in *Glasper* regarding structural error is applicable to our consideration of the second prong of the *Herron* test. See *Thompson*, 238 Ill. 2d at 613-14 (Illinois Supreme Court recognized that in *Glasper* it had equated second prong plain error review with structural error).

In reaching its conclusion that the error at issue in *Glasper* was not automatically reversible error, the supreme court stated that the failure to ask a jury venire whether they understood and accepted that the defendant's failure to testify could not be held against him "[did] not involve a fundamental right, or even a constitutional protection." *Glasper*, 234 Ill. 2d at 193. Rejecting the defendant's argument that his constitutional rights were violated by the trial court's error, the supreme court acknowledged that Rule 431(b) was designed to help ensure that defendants were tried before a fair jury, however, the supreme court noted that it could not conclude that Rule 431(b)(4) questioning was indispensable to a fair trial. *Glasper*, 234 Ill. 2d at 196. Rather, the error in *Glasper* and the instant case "involves a right made available only by rule" of the Illinois Supreme Court. *Glasper*, 234 Ill. 2d at 193. Further, the supreme court stated that "[t]he violation of a Supreme Court Rule [did] not mandate reversal in every case." *Glasper*, 234 Ill. 2d at 193. The *Glasper* court

17

also recognized that it was free to determine whether, as a matter of state law, the failure to question the venire in accordance with Rule 431(b) was an error so severe that reversal was required, regardless of whether the error was structural under federal law. *Glasper*, 234 Ill. 2d at 199-200. The supreme court declined to do so. *Glasper*, 234 Ill. 2d at 200.

We acknowledge that *Glasper* considered the previous version of Rule 431(b), which is not at issue here. The only difference between the older version of the rule and the current version is that the trial court is now required in all cases to ask prospective jurors of their understanding and acceptance of the listed principles, regardless of whether a defendant requests any such questioning. That difference, however, does not preclude the application of the *Glasper* rationale to the instant case. See *Thompson*, 238 Ill. 2d at 610.

The *Glasper* opinion also noted that in *People v. Emerson*, 122 Ill. 2d 411 (1987), the supreme court "moved away from the portion of the *Zehr* holding which stated that the relevant questions should be covered 'in the course of interrogation on *voir dire*,' and that the failure to ask these questions amounts to 'prejudicial error.' " *Glasper*, 234 Ill. 2d at 197 (quoting *Zehr*, 103 Ill. 2d at 477-78). In *Emerson*, the supreme court considered whether the trial court erred by refusing to ask prospective jurors whether they understood that an accused was presumed to be innocent and whether they had any objection to that principle. *Emerson*, 122 Ill. 2d at 425-27. The trial court declined the defendant's request to ask those questions because the trial court believed it had sufficiently covered those principles in other remarks. *Emerson*, 122 Ill. 2d at 425. The trial court had instructed the prospective jurors on the *Zehr* principles and had asked the jury panel whether they could follow the law as instructed by the court. *Emerson*, 122 Ill. 2d at 426. The supreme court concluded that the trial court's instructions coupled with that question satisfied *Zehr*. *Emerson*, 122

18

Ill. 2d at 427.

In this case, at the beginning of the *voir dire*, the trial court informed the jury pool of the four principles set forth in Rule 431(b). Additionally, the trial court questioned the potential jurors regarding the first of these principles, albeit in a slightly different form, when it asked "Do you have any bias against a person merely because he has been charged with a criminal offense?" The trial court also asked the jurors a series of questions regarding their ability to follow the court's instructions, decide the case fairly and without prejudice, and wait until the conclusion of all evidence to formulate an opinion. In light of these circumstances, we do not believe that the trial court's failure to strictly comply with Rule 431(b) denied the defendant an impartial jury and, thus, a fair trial. See *Glasper*, 234 Ill. 2d at 200-01; *Emerson*, 122 Ill. 2d at 426-27; *Thompson*, 238 Ill. 2d at 614-15. As with the defendant in *Thompson*, the defendant here has failed to establish that the trial court's violation of Rule 431(b) caused the jury to be biased or that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. See *Thompson*, 238 Ill. 2d at 615. Thus, the second prong of plain error review does not provide a basis for excusing defendant's forfeiture of this issue. See *Thompson*, 238 Ill. 2d at 614-15.

The defendant also argues that the court undermined the importance of the Rule 431(b) principles when it stated that these principles were fundamental principles, but not instructions of law, which the jury would receive at the end of the case. The court's comments seem to be taken from the language of Rule 431. Rule 431(b) calls the relevant principles "principles." In addition, Illinois Supreme Court Rule 431(a) (eff. May 1, 2007) directs the court to "acquaint prospective jurors with the general duties and responsibilities of jurors," and cautions the court not to question jurors on matters of law or instructions. We decline to find that the court's decision to use language from Rule

19

431 caused the jurors to believe that they need not concern themselves with the principles stated by the court.

CONCLUSION

Based upon the above analysis, we find that the trial court's failure to *sua sponte* instruct the jury under IPI Criminal 4th No. 24-25.09X was not plain error. In addition, trial counsel was not ineffective for failing to request that instruction. Finally, although the trial court erred by failing to question the prospective jurors about their acceptance of the principles set out in Rule 431(b), that failure did not render the defendant's trial fundamentally unfair. Accordingly, the judgment of the Peoria County circuit court is affirmed.

Affirmed.

JUSTICE McDADE, specially concurring

I concur in this decision because that result is required by the supreme court's recent decision in *People v. Thompson*, 238 Ill. 2d 598 (2010).

I write separately to emphasize to defense counsel that they rely on the language of rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)) to the peril of their clients.

In the 2007 amendment to rule 431(b), the supreme court eliminated language requiring that the defendant ask the court to instruct or question jurors on the four fundamental trial principles included in the rule. In that amendment, the court appeared to place the burden of fully instructing the jury about the *Zehr* principles wholly on the trial court judges. Now with its decision in *Thompson* the supreme court, despite both the evolution of rule 431(b) and its plain language, effectively puts the burden once again on defendant, through his counsel, to *ask* the court to carry out its responsibility or to object if it does not do so fully.

If the defendant fails to do either of those things, he or she is obligated to prove prejudice attributable to that specific error on the part of the trial judge. *Thompson*, 238 Ill. 2d at 614. I find it virtually impossible to envision a likely situation in which, in the absence of appropriate questioning of the jurors by the trial court or an outright posttrial declaration of a violation by a juror, a defendant could possibly prove the requisite prejudice.

The supreme court continues to declare that its rules are not mere suggestions but are mandatory and, while they are not law, they do have the force of law. *In re Denzel W.*, 237 Ill. 2d 285 (2010). Doing the 431(b) *voir dire* as specified in the rule is not rocket science. Nonetheless, the court requires the defendant to meet a seemingly impossible standard of proof to redress the trial court's failure to follow the rule.

Following *Thompson*, defense attorneys and prosecutors who are committed to maintaining the level playing field required for a properly-functioning adversarial criminal justice system must be vigilant in ensuring that potential jurors are adequately -- by which I mean in a manner *actually* compliant with the procedures the supreme court has set out in rule 431(b) -- instructed on the fundamental principles articulated and protected in *People v. Zehr*, 103 Ill. 2d 472 (1984).