NOTICE

Decision filed 11/08/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220005-U

NO. 5-22-0005

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Edgar County. |
| | ) | |
| v. | ) | No. 21-CF-90 |
| | ) | |
| ZACHARY R. SMITH, | ) | Honorable |
| | ) | Steven L. Garst, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Vaughan and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: Judgment entered on defendant's conviction of first degree murder affirmed over his claims that the State failed to disprove self-defense, that the trial court abused its discretion in excluding *Lynch* evidence and failing to comply with Rule 431(b), and that trial counsel rendered ineffective assistance of counsel.

¶ 2    A jury in the trial court of Edgar County found defendant, Zachary R. Smith, guilty of first degree murder, and the court sentenced him to 45 years in prison. On appeal, defendant raises four primary contentions of error. First, defendant argues that the State failed to prove beyond a reasonable doubt that defendant did not act in self-defense and, alternatively, that this court should reduce his conviction to second degree murder, where he proved his actions were the result of unreasonable self-defense. Second, defendant argues he was denied a fair trial and the right to a complete defense, where the court excluded crucial *Lynch* evidence of the torture and mistreatment

1

of rabbits by the victim, Matthew Morgan. Third, defendant argues that trial counsel provided ineffective assistance of counsel by failing to request Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (4th ed. 2000) (hereinafter IPI Criminal 4th) and elicit testimony from defendant regarding his knowledge of victim's mistreatment of rabbits to establish victim's reputation for violence and support defendant's theory of self-defense. Lastly, defendant argues that the court erred by failing to ensure that jurors understood and accepted the four fundamental legal principles outlined in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 3                                    I. Background

¶ 4      On June 8, 2021, defendant was involved in an altercation with victim, defendant's neighbor. Defendant shot victim during the altercation, and victim died as a result of his injuries. We recite only those facts necessary to our understanding of the case and resolution of this appeal.

¶ 5      On June 10, 2021, the State charged defendant by information with one count of first degree murder in violation of section 9-1(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(2) (West 2020)), alleging that defendant, without lawful justification, shot victim with a .38-caliber revolver (gun), knowing said act created a strong probability of death or great bodily harm to victim, thereby causing victim's death. The State further alleged that defendant discharged a firearm proximately causing death, requiring a 25-year firearm enhancement to be added to the term of imprisonment (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020)), with 3 years of mandatory supervised release (MSR). The circuit court appointed counsel (trial counsel) to represent defendant.

¶ 6      On September 13, 2021, defendant filed a motion *in limine* asserting self-defense as an affirmative defense and requesting to introduce evidence of victim's alleged aggressive character and reputation for violence pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984). Defendant sought

to present evidence of victim's violent slaughter of hundreds of rabbits to show the aggressive and violent character of victim, and that defendant's knowledge of victim's violent tendencies affected defendant's perceptions of, and reactions to, victim's behavior when defendant shot and killed victim. Defendant also sought to present evidence of defendant's awareness of victim's 2019 battery conviction against victim's mother-in-law, Diana Turner, and a resulting order of protection. Additionally, defendant sought to introduce evidence of a 2014 order of protection that victim's wife, Avery Morgan, sought against victim. To support his claim of self-defense, defendant sought to present evidence of defendant's knowledge of (1) threatening statements victim made in the past, (2) threatening and violent statements victim made during the confrontation that led to the altercation at issue, and (3) the knife victim possessed on his person at the time of the altercation.

¶ 7 On October 8 and October 12, 2021, the trial court held hearings on defendant's motion *in limine*. The following evidence was presented at the hearings.

¶ 8 The defense first called Tabitha Brewer, defendant's fiancée, who testified to the following. Diana, Avery, Madison Brewer, and her brother, Christopher Brewer, informed Tabitha that victim bit off the ears, broke, burned, and skinned rabbits alive. Tabitha never saw victim abuse animals; however, she saw a rabbit foot and fur behind victim's garage, and Madison showed her pictures of dead rabbits in plastic totes. On cross-examination, Tabitha testified that Avery told Madison who told Tabitha that victim bit off an ear and broke the legs of a rabbit.

¶ 9 Next, the defense called Zane Jayne, Christopher Brewer's friend, who testified to the following. According to Zane, Madison and Christopher found victim high on methamphetamine surrounded by dead rabbits in victim's attic one year before the shooting. Madison and Christopher also told Zane four or five years ago that victim beat Madison's dog.

3

¶ 10    The defense also called Stephanie Baker, Christopher's mother, who testified to the following. Stephanie testified that victim abused rabbits by maiming and dismembering. Christopher and Madison told Stephanie that they found dead rabbit carcasses in a tote a few years ago.

¶ 11    Lastly, defendant testified that he witnessed victim abuse rabbits one year prior when victim left rabbits outside in the hot sun without food or water. Victim also "bash[ed] some of [the rabbits] off the concrete walkway." Two-and-a-half to three years prior, Madison and Christopher told defendant that victim slaughtered over 100 rabbits in his attic while high on methamphetamine. Three-and-a-half years ago, Christopher, Madison, and Avery told defendant that victim bit off a rabbit's ear and broke its legs. On cross-examination, defendant acknowledged that victim fed his pet python rabbits and also bred rabbits on his property.

¶ 12    Next, the State called Madison, Avery's sister and Christopher's wife, who testified to the following. Avery purchased a reticulated pet python snake three years ago. Avery and victim fed the pet python two to three larger rabbits per week. They usually killed multiple rabbits at one time, feeding one or two rabbits to the pet python and then freezing the remaining rabbits in bags in totes for future feedings. Victim never used a knife to kill the rabbits, although Madison recalled that victim skinned rabbits a few times attempting to cure or tan the hides. According to Madison, victim did not kill rabbits for any reason other than to feed the pet python. Additionally, victim did not abuse rabbits by breaking legs or biting off ears, abuse or torture dogs, and Madison never saw dead rabbit carcasses in the yard or garage. Madison testified that Avery, however, delivered a damaged rabbit to defendant after the pet python bit off an ear and broke the legs of a rabbit. On cross-examination, Madison acknowledged that victim used methamphetamine in the past, however, to her knowledge, victim did not injure rabbits while on methamphetamine. Madison

4

denied that victim beat her dog, testifying that a veterinarian determined that the dog suffered a sprained kneecap ligament after the dog jumped off the bed.

¶ 13    On October 13, 2021, the trial court entered a written order allowing defendant to introduce victim's 2019 battery conviction and accompanying order of protection into evidence, pursuant to *Lynch*, as evidence of propensity towards violence. The court denied use of a 2014 order of protection as impeachment evidence against Avery, finding the case too remote in time to the June 8, 2021, shooting. The court, pursuant to *Lynch*, barred any testimony regarding victim's reputation for violence towards rabbits, finding "no correlation existed between killing rabbits, either for pleasure or more likely, to feed Avery Morgan's pet reticulated python, than any alleged propensity for violence toward people by Matthew Morgan." The court, however, allowed defendant to seek reconsideration if he discovered caselaw in support of his request.

¶ 14    On November 1, 2021, defendant filed a second motion *in limine*, again, asserting self-defense as an affirmative defense and requesting that the trial court bar any evidence of defendant's alleged violent or aggressive character or reputation, unless defendant affirmatively opened the door by testifying about his peaceful character. Shortly thereafter, defendant filed a third motion *in limine* requesting that the court bar any opinion testimony of witnesses, specifically, that of police officers from Paris, Illinois, as to the potential danger of the knife at the time of the shooting. Following a hearing, the court granted defendant's motions.

¶ 15    On November 12, 2021, the State filed a motion *in limine* requesting that the trial court bar defendant from referring to allegations regarding victim's abuse, killing and/or torture of animals, statements alleging methamphetamine use by victim, and Avery's 2014 order of protection against victim. Following a hearing on the State's motion that day, the court barred any allegation that victim used methamphetamine, unless the State opened the door during direct examination, and,

5

without objection by trial counsel, barred defendant from testifying to the 2014 order of protection. Additionally, the court, refusing to create a "mini" trial within a trial, failed to see a connection between victim allegedly hurting a dog and harming a person. The court reserved its ruling regarding victim's mistreatment of animals.[1] The court set defendant's jury trial for November 16, 2021.

¶ 16    On November 16, 2021, defendant's three-day jury trial commenced, and the trial court conducted *voir dire*. The following day, the parties presented opening statements, and the court heard the following testimony.

¶ 17    A. Avery Morgan

¶ 18    The State first called Avery, who testified to the following. Avery and victim lived across the street from defendant and Tabitha. The two families frequently socialized together, and Avery regularly babysat defendant's daughters. Prior to the June 8, 2021, shooting, victim, defendant, and Christopher hung out "every day, [or] every other day" for two years. Avery could not recall any fights, arguments, or bad blood between victim, defendant, and Christopher.

¶ 19    On June 8, 2021, Avery, victim, and the couple's seven-month-old daughter returned home around 7 p.m. As Avery drove down her street, she almost accidentally hit Winter, defendant's daughter, with her car when Winter "last minute *** jolted over" on her bike. Avery yelled at Winter, at which time defendant appeared on his front porch. Defendant stated, "Hey, bitch, don't yell at my daughter like that. If anybody is going to yell at her, it will be me, she's fine." Victim, who sat in the passenger seat, immediately responded to defendant, "Hey, don't you call my wife a bitch. What do you want us to do, hit the kid next time. Come on." As Avery pulled her vehicle

---

[1]A docket entry indicates that the trial court "reserved ruling on cross-examination." Based on a review of the report of proceedings, the court reserved ruling on allegations that defendant made to Special Agent Corina Mead of the Illinois State Police during Mead's cross-examination.

into her driveway, defendant responded, "If you run my kid over, I'll shoot you in the fucking head." Avery exited her vehicle and walked inside. At that time, defendant also walked inside, while victim removed his child from the vehicle. Upon entering her home, Avery yelled for Madison and Christopher, informing the household of the argument outside. Shortly thereafter, Avery heard victim slam the car door shut, which sounded like a "loud bang." Avery immediately ran outside following Maycee Tretter, a child that Avery regularly babysat.

¶ 20    Once outside, Avery observed the car door closed, her daughter in her car seat at edge of the road, and victim standing in gravel at the edge of defendant's lawn. Victim "had his arms up *** saying, [w]hat are you going to do threaten me with a pistol? You are going to shoot me?" Defendant did not answer. Victim "took two strides from the gravel" towards defendant. Defendant then "stomped down the last two steps of his deck stairs, swung a gun around and fired my husband in the chest." Defendant stood approximately five feet from victim when defendant fired his gun. Victim fell to the ground on his knees and then his chest. Avery immediately ran to defendant's property. When she arrived in defendant's yard, defendant tossed the gun behind him, saying "What did you expect? Told you so." Avery rolled victim over on his back, while Madison applied pressure to victim's wound. When Christopher arrived, defendant stated he fired the gun in self-defense and then performed CPR on victim. Approximately 30 seconds later, a police officer arrived. Paramedics transported victim via ambulance to the hospital where he died.

¶ 21    On cross-examination, Avery acknowledged victim's 2019 battery conviction, where victim pushed Avery's mother, Diana. Specific to June 8, 2021, Avery walked inside her home following the argument on the street, however, approximately 20 seconds later, Avery saw victim near defendant's property. According to Avery, victim collapsed near a tree located four or five feet from the edge of defendant's grass near the gravel. Avery testified that victim told defendant

7

that "they should fight it out like men." In response, Avery testified that defendant said, "I'm done," ran inside, and then appeared outside with a gun. Avery clarified that defendant, carrying a gun in his right hand with the gun pointed down, stomped down his front steps, swung the gun to his left side, and pulled the trigger with both hands. At that time, victim's hands were up in the air. Avery testified that defendant immediately vocalized that he shot defendant in self-defense.

¶ 22    On redirect examination, Avery testified that victim was approximately "three to four strides" away from defendant when defendant shot victim. Defendant and victim were not within arm's reach of each other.

¶ 23    B. Madison Simpson

¶ 24    Madison Simpson testified to the following. On June 8, 2021, Simpson dropped off a friend across from defendant's property. While inside, Simpson heard a loud bang, prompting her to open the front door.[2] While looking through a glass door, Simpson observed two people walking towards each other. Simpson then saw defendant "pull[ ] his arm up with a [gun]" and shoot victim. Simpson acknowledged she could see only half of victim's body, due to a tree, and she saw defendant's hand between the antenna and windshield of a vehicle. Madison heard a "pop" noise, at which time victim fell near a tree. The entire incident lasted approximately six seconds. On cross-examination, Simpson testified that she observed victim walk rapidly towards defendant with his hands down. Simpson did not observe a weapon on victim.

¶ 25    C. Maycee Tretter

¶ 26    Maycee testified to the following. Avery regularly babysat 11-year-old Maycee. On June 8, 2021, Avery ran into the house stating that defendant and victim were arguing. Maycee, the first individual to walk outside, heard defendant and victim yell at each other. Maycee saw victim step

[2]Similar to Avery, Simpson heard victim slam the car door shut.

8

onto defendant's grass with his "arms out to his sides," while defendant stepped off his front porch carrying a gun in his right hand. When defendant and victim stood approximately five or six feet apart, not within arm's reach, defendant fired his gun seconds later. Maycee noticed Avery and Madison on the front deck with her when Avery ran past Madison screaming. On cross-examination, Maycee confirmed that Avery and Madison stood outside on the front deck when defendant shot victim.

¶ 27    D. Madison Brewer

¶ 28    Madison Brewer, Avery's sister, testified to the following. Defendant, victim, and Christopher hung out regularly, and the families socialized every day. On June 8, 2021, Madison confirmed that Avery entered the house to inform her and Christopher that defendant and victim were arguing outside. According to Madison, this was unusual, so Madison rushed outside. Maycee walked outside first followed by Avery and then Madison. Once outside, Madison saw victim on his knees falling forward into defendant's grass. Madison testified that two or three minutes passed from the time Avery entered the home to when Madison ran to victim's side. Madison attempted to stop victim's bleeding, while defendant performed CPR, saying that "he didn't mean to and to stay with him, talking to [victim]." Madison never witnessed any prior hostility or altercations between defendant and victim. On cross-examination, Madison admitted that victim and defendant were not close friends.

¶ 29    E. Christopher Brewer

¶ 30    Christopher Brewer testified to the following. Christopher and defendant knew each other for six years and socialized every day. Christopher frequently hung out with victim and defendant. According to Christopher, the families regularly socialized. Christopher never witnessed a physical altercation between victim and defendant prior to the shooting.

9

¶ 31    On June 8, 2021, Christopher, defendant, and victim smoked marijuana at 4 p.m. Around 6 p.m., Avery interrupted the men, and Avery and victim left shortly thereafter. Christopher entered his home to watch a movie, and defendant went home. Christopher testified consistently with prior testimony regarding Avery's interaction with defendant, Madison's attempt to stop victim's bleeding, and defendant performing CPR.

¶ 32    F. Andrew Hutson

¶ 33    Sergeant Andrew Hutson of the Paris Police Department testified to the following. Sergeant Hutson arrested defendant on June 8, 2021, after defendant acknowledged himself as the shooter. Sergeant Hutson placed defendant in his squad car, stood near the left rear door, and conversed with defendant in an attempt to establish motive. According to Sergeant Hutson, defendant told victim, "Don't come in my yard, I have a gun." After that, defendant informed Sergeant Hutson that "he raised his arm, fired one shot, [victim] collapsed to the ground and then he laid the gun down and attempted to apply pressure to the open bullet wound." Defendant did not state to Sergeant Hutson that victim made "any verbal threats in specific detail" before defendant shot him. The only indication that Sergeant Hutson "got from [defendant] was that [victim] kept advancing into his yard" after defendant told victim he had a gun. Defendant, who expressed emotion during the above conversation, told Sergeant Hutson that "there had been no past threats and he wasn't intimidated by [victim]."

¶ 34    G. Jessica Taylor Reed

¶ 35    Jessica Taylor Reed, a paramedic shift lead at Horizon Health EMS, responded to the dispatch call on June 8, 2021. Reed performed a physical assessment of victim in the ambulance, at which time she discovered a knife in his pocket. On cross-examination, Reed confirmed that she saw the handle of victim's knife "sticking out of his pocket."

¶ 36    H. Jessica Hopper

¶ 37    Jessica Hopper, a paramedic at Horizon Health EMS, testified that Reed pointed out victim's knife in its sheath in his right pocket. Hopper noticed victim's knife only after Reed pointed it out in the ambulance after paramedics performed CPR on victim on the ground and transported victim to the ambulance. The State rested its case, and defendant presented his case-in-chief.

¶ 38    I. Avery Morgan

¶ 39    Avery testified to the following details as an adverse witness. Victim wore his knife on his belt when defendant shot him. On cross-examination, Avery clarified that victim "slipped [the knife] through the belt loop and into his pocket and made sure it was all strapped and snapped into the sheath."

¶ 40    J. Defendant

¶ 41    Defendant testified to the following details on his own behalf. On June 8, 2021, Avery and victim sped down the street between 7 and 7:30 p.m. Defendant stood on his front porch while his daughter rode her bike in the road. Avery slammed on her brakes before she yelled at defendant's daughter, calling Winter a "dumb little bitch and a stupid little cunt for being that close to the road." Defendant told Avery not to yell at his daughter, at which time victim "leaned halfway out the passenger side window, said he was going to come beat my ass, put me in the fucking ground." Victim "[t]hreatened to run over my daughter if they seen [*sic*] her in the road again." Defendant then walked into his trailer to tell Tabitha about the incident. Before defendant walked outside, he grabbed his gun "for protection" from his safe and placed it in his back pocket.

¶ 42    Once outside, defendant walked down his porch steps and into his yard 3½ or 4 feet. At that time, victim, near the back passenger side of his vehicle, stood up and started to advance across

11

the street. Defendant told victim to stop and stay in his yard. Victim did not stop. victim "kept advancing across the road. I told him, [d]o not come into my yard." Victim did not stop. Defendant, with the gun in his left back pocket, informed victim he had a gun. When victim advanced 3½ or 4 feet into the yard, defendant "pulled the firearm out to brandish it, held it at the low ready with [his] right hand up." Defendant "had [the gun] in [his] left hand *** [and] with [his] right hand up extended in the stop motion telling him to stop." The following colloquy took place between defendant and trial counsel:

"Q. What happened next?

A. He kept advancing, I told him to stop another time. He got pretty much in line with the tree, which was about five foot [*sic*] away from me. He dropped his left shoulder down, brought his right hand up in this kind of motion [indicating], reaching for the knife in his pocket.

Q. Now, you said he was reaching for the knife, what do you know about that knife?

A. (No reply.)

Q. When did you see it?

A. I seen [*sic*] it about two foot [*sic*] away from that before he started reaching for it.

Q. And where was it?

A. It was in his right pocket.

Q. Had you seen that knife before?

A. No, sir, I had not.

Q. Okay. So he's then, you said, reaching with his right hand toward the knife?

A. Yes, sir.

Q. And what happened then?

A. I felt my life was in imminent danger because of him reaching for the knife, pulled the gun up and shot.

12

Q. Again, [with] your left hand?

A. Yes, sir.

Q. Now, before you did, before you pulled the gun up and shot, what was [victim] doing? What was his physical standing? Was he standing with his arms out? ***

* * *

A. [Victim] dipped his left shoulder down and brought his right hand up (indicating).

Q. So he was leaning forward?

A. Yes, sir.

Q. And then after you pulled the trigger, he went down, is that correct?

A. Yes, sir.

Q. And where did he—how did he fall?

A. He fell face first."

¶ 43 On cross-examination, defendant admitted that he regularly socialized with victim and victim's family, and that defendant's children spent time at victim's home without defendant or Tabitha present. Specific to June 8, 2021, defendant testified that victim, standing approximately 100 feet from defendant, "stalked across the street," with Winter roughly 40 or 45 feet away from defendant. Defendant worried victim would hurt Winter. Defendant, however, confirmed that he originally left Winter outside near the road after the verbal altercation with victim. Defendant confirmed that, although he told Winter to walk inside, defendant left her outside when he walked inside to grab his gun. According to defendant, he grabbed the gun because he did not hear Winter walk inside. Defendant admitted that he did not check the trailer for Winter before he walked outside. The following colloquy took place between the State and defendant:

"Q. So he had threatened you in the car and you walked away, and he *** then went to do whatever he's doing in his car, and then without having chased you in your yard or

13

chased after you, he just went to his car and then waited till he saw you on the porch and then decided, I'm going to go get after him?

A. Yes.

Q. And you hadn't said anything yet?

A. No.

Q. He just decided we have unfinished business[,] and he starts towards you?

A. Yes.

Q. Because your daughter was somewhere in between there, you were on alert?

A. Yes.

Q. And then you walked down the stairs?

A. Yes.

Q. He kept coming?

A. Yes.

Q. You took a step or two off the stairs and he kept coming?

A. Yes."

Defendant told victim to stop walking towards him several times. Victim, however, did not say any words to defendant during this time. Winter walked behind defendant, while victim continued to advance. Defendant brought the firearm from his back pocket when victim was two strides from defendant's lawn in the gravel on the shoulder of the road. Victim then took three to four strides into defendant's yard while defendant stood near the porch steps in the grass. Defendant held his gun "at a low ready" at that time.

¶ 44 Defendant admitted he had de-escalation training as a former correctional officer. Defendant did not utilize any de-escalation training with victim, stating "[d]e[-]escalation is just trying to talk your way out of a situation, and there was no talking" with victim. The following colloquy took place between the State and defendant:

14

"Q. Now, prior to that time you've had no physical beefs with [victim], correct?

A. Correct.

Q. And prior to that time *** you weren't intimidated by him, correct?

A. I wouldn't say that, but.

* * *

Q. Do you dispute Officer Hutson was accurate when he said you weren't intimidated by [victim]?

A. At that time I was, but any other time before that, no.

Q. So now this intimidation was, he never bothered you before, you weren't worried about physical safety before this incident, correct?

A. Correct. Other than when he threatened one of the neighbors and two people that used to live with him.

Q. *** But the idea of threatening other people, were you present when he threatened other people?

A. Yes.

Q. So the idea that he threatened another neighbor or threatened somebody else still didn't intimidate you before you told Officer Hutson you weren't intimidated by him, is that correct?

A. Yes."

Defendant testified that he shot victim when victim was about 1½ strides, or five feet, from defendant. Defendant first noticed victim had a knife right before victim "drop[ped] his *** left shoulder to bring his right hand up to grab the knife." Although defendant assumed victim had the knife in a sheath, he believed victim "could have pulled the knife out in a matter of half a second, took a step, lunged and stuck it in me." Although victim did not communicate with defendant at any time as he approached defendant, defendant confirmed that he took victim's movement to mean that victim would go for his knife, which prompted defendant to shoot him. On redirect,

15

defendant testified that, as "an asthmatic," he could not run from victim, which factored into his decision to shoot victim.

¶ 45   K. Madison Brewer

¶ 46   Madison testified that victim wore a knife every day "on his belt, hanging or on his belt tucked in his pocket."

¶ 47   L. Diana Turner

¶ 48   Diana testified to the following. While Diana and Avery engaged in a physical altercation, victim stepped in and pushed Diana up against a car door, resulting in a battery conviction and restraining order against victim in 2019.

¶ 49   M. Corina Mead

¶ 50   Special Agent Corina Mead of the Illinois State Police testified to the following. Mead interviewed defendant for approximately two hours following the June 8, 2021, shooting. Defendant told Mead that as victim continued to walk towards defendant, defendant pulled the gun from his back pocket, held the gun "straight out," and told victim to stop as victim stomped, charged, and lunged at him. Defendant, holding the gun in his left hand, fired the gun at victim when victim came within three to four feet of defendant. Defendant never stated that he held the gun in low ready position. Defendant first noticed victim's knife when victim approached him halfway in the street.

¶ 51   Mead highlighted multiple inconsistent statements made by defendant. First, defendant made inconsistent statements as to whether victim lunged before or after defendant pulled the gun from his back pocket. Next, defendant stated that he went inside the trailer to inform Tabitha of the argument with victim when defendant realized Winter did not follow him inside. Defendant told Tabitha he would retrieve Winter. Shortly thereafter, defendant stated that Tabitha told him

to go outside to retrieve Winter. Additionally, defendant slightly changed his story, "saying that he went inside because he was terrified for his life, that [victim] was going to beat down his door and go inside[ ] [defendant's] house." Halfway through the interview, defendant told Mead that "he had went to the safe before he was certain that his daughter was back outside."

¶ 52    On cross-examination, Mead acknowledged that defendant stated that he feared victim when defendant pulled the trigger. Mead acknowledged that defendant displayed the gun to victim, and defendant saw victim's knife prior to defendant shooting the gun. On redirect, Mead stated that, although defendant consistently stated he was fearful of victim, defendant's description of their relationship changed throughout the course of the interview. Mead testified to the following:

> "The very first version he told us is that they have never had a problem. They've always been cool. He, shortly after, *** said that he would consider them friends. They hung out, drank together on occasion, fixed four-wheelers together.
>
> Throughout the interview, different inconsistencies where *** he said, at one point, he never liked him. He also said that he felt threatened by [victim] several times in the past to they never have any beef. And it went back and forth several times.
> ***
> *** At the very end, he actually said that [victim] had changed since he returned back home and that he's been a great guy, was a phrase he used. He is spiritual."

When asked if victim threatened defendant in the past, defendant originally said "no, not to my knowledge." Later on, defendant said victim threatened to burn down his house at one point.

¶ 53    On recross, trial counsel attempted to elicit testimony about what defendant said to Mead about rabbits. Trial counsel argued that the State opened the door when it asked Mead about defendant's statements regarding being scared of victim. The trial court denied trial counsel's request to discuss "the killing of animals."

¶ 54    Following testimony, outside the presence of the jury, the State requested that the jury receive instruction on the law pertaining to the initial aggressor's use of force pursuant to IPI

Criminal 4th No. 24-25.09. People's Instruction 18 read: "A person who initially provokes the use of force against himself is justified in the use of force only if the force against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." IPI Criminal 4th No. 24-25.09. The following conversation took place:

> "MR. MCGRATH [(TRIAL COUNSEL)]: *** [T]here is no evidence to meet the standard for declaring [defendant] to be the aggressor. I don't think reading the State's evidence in the light most favorable to the State would give you that determination.

> I acknowledge that there is no statutory definition of aggressive—aggressor, essentially. But the evidence does not show that he initiated any contact or any actions of his that would be determined to be aggressive in terms of a fight or in terms of initiating contact or confrontation. The evidence is he was in his yard and *** [victim] *** came into [defendant's] yard.

> THE COURT: Mr. Isaf.

> MR. ISAF [(ASSISTANT STATE'S ATTORNEY)]: [Defendant] armed himself, brought the firearm out and instigated—I say he becomes the aggressor when he produces the weapon. The question of whether walking into someone's yard is sufficient instigation or provocation for great deadly force or great bodily harm—inflicting great bodily harm or using deadly force, that's the question of the trial. But I say he becomes the aggressor because he produces the firearm and the weapon before the victim did anything.

> MR. MCGRATH: Your Honor, [defendant] has a Constitutional Right to produce a weapon from his house to his yard. There is no criminal history. There's no inherent aggression or violence involved in having a handgun in his possession. There is no evidence that [victim]'s actions were related in any way, shape or form to him coming back outside with a handgun.

> THE COURT: Anything else, Mr. Isaf?

> MR. ISAF: That's for the jury to decide. Being on your property and brandishing— not having a possession of a firearm on your property, but, again, defending your property with deadly force is different than defending your property, reasonable force against reasonable force. [Defendant] produces a firearm or deadly weapon or a weapon that can

18

induce great bodily injury that, to me, is becoming an aggressor. You cannot shoot trespassers.

MR. MCGRATH: Your Honor, the instruction in regard[ ] to justification goes through all of that. It says that you cannot produce a weapon and use it unless you're in imminent danger of bodily harm or death. The aggressor instruction relates to the duty that you have. It doesn't relate to the standard as to what you can and can't do to the person coming into your yard.

So I think—this is an extra instruction that specifically allows for an obligation on [defendant's] part that isn't there if he's not the aggressor, and I don't believe he is the aggressor by any of the evidence.

THE COURT: I'm going to allow the instruction. It is my understanding that [defendant] indicated he had a gun before there was any testimony that he went into a crouch or appeared to reach for the knife, that until the statement of, I've got a gun and stop, there had been no indication by [victim] that he was moving towards the knife or anything else. So I am going to allow the instruction to be given."

Neither party requested IPI Criminal 4th No. 24-25.09X, which states: "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." Following deliberations, the jury returned a verdict finding defendant guilty of first degree murder.

¶ 55   On December 22, 2021, defendant filed a motion for new trial raising four primary contentions of error. Defendant argued that the trial court erred in denying parts of his motion *in limine*, including the denial of defendant's right to introduce evidence of victim's reputation for violence by witnesses who would testify that defendant violently slaughtered rabbits. Defendant also argued that the court erred by (1) limiting defendant's right to produce evidence of allegations of victim's abuse, killing, and/or torture of animals; (2) denying defendant the opportunity to cross-examine Mead about defendant's statements concerning his knowledge of allegations of victim's slaughter of rabbits, which caused defendant to fear victim; and (3) denying defendant's objection to the State's tendered jury instruction, IPI Criminal 4th No. 24-25.09X.

19

¶ 56    On December 30, 2021, the trial court heard argument on defendant's motion for a new trial, which the court denied. That same day, the trial court sentenced defendant to 45 years in prison with 3 years' MSR. Defendant filed a timely notice of appeal. Additional facts will be presented as necessary in the analysis portion of this order.

¶ 57                                    II. Analysis

¶ 58    Before addressing defendant's arguments on appeal, we find it necessary to discuss a potential jurisdictional issue. Although neither party raised this issue, we have an obligation before going forward to determine whether jurisdiction to hear this appeal exists. *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539 (1984). We note that motions for a new trial must be filed "within 30 days following the entry of a finding or the return of a verdict." 725 ILCS 5/116-1(b) (West 2020). The trial court, however, may exercise its discretion to consider the motion filed after the 30-day period but before the imposition of sentence. See *People v. Talach*, 114 Ill. App. 3d 813, 818 (1983) (trial court retains jurisdiction after 30 days from the entry of the verdict because the final judgment in a criminal case is the pronouncement of sentence).

¶ 59    With these principles in mind, here, the trial court had discretion to consider defendant's untimely motion for a new trial. The jury returned its verdict on November 18, 2021, and defendant filed his posttrial motion on December 22, 2021. The trial court held defendant's sentencing hearing on December 30, 2021, and defendant filed a timely notice of appeal on January 5, 2022. Illinois Supreme Court Rule 606(b) (eff. July 1, 2017) requires that an appeal be filed within 30 days of an entry of final judgment. Although defendant filed his motion for a new trial more than 30 days after the jury returned its verdict, defendant timely filed his notice of appeal following the entry of the court's sentencing order on December 30, 2021. Accordingly, we have jurisdiction and will address the merits of defendant's appeal.

20

¶ 60    A. Guilty Beyond a Reasonable Doubt

¶ 61    Defendant first argues on appeal that the State failed to prove beyond a reasonable doubt that he did not act in self-defense, and alternatively, requests that this court reduce his conviction to second degree murder, where the evidence demonstrated his actions resulted from unreasonable self-defense. In response, the State contends that the evidence established defendant unjustifiably shot victim in the chest from five feet away, without a belief, either reasonable or unreasonable, that defendant needed to use deadly force to protect himself from imminent harm. Accordingly, the State asserts the evidence proved defendant guilty beyond a reasonable doubt of first degree murder. We agree with the State.

¶ 62    When a defendant challenges the sufficiency of the evidence used to convict that defendant, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime of which a defendant is convicted. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007) (citing *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). It is not the function of this court to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209 (2004)). Rather, where, as here, the testimony of the witnesses is in conflict, the trier of fact must determine the credibility of the witnesses, weigh their testimony, draw reasonable inferences, and resolve conflicts in the evidence. *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 113 (citing *Evans*, 209 Ill. 2d at 211). In essence, "[a] conviction will stand unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt." *People v. Radford*, 2018 IL App (3d) 140404, ¶ 30 (citing *Evans*, 209 Ill. 2d at 209).

21

¶ 63　　To sustain a conviction for first degree murder, the State must prove that a defendant killed another individual without lawful justification, and in performing the acts which caused the death, he intended to kill or do great bodily harm or knew that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (2) (West 2020). "One of the recognized justifications to first degree murder is the affirmative defense of self-defense." *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). When a murder defendant asserts self-defense, "the State must prove *more* than the three elements of first degree murder. The State must also prove that the murder was not carried out in self-defense, and that the defendant's use of force was not legally justified." (Emphasis in original.) *Id.* After the State establishes the elements of first degree murder, the trier of fact next addresses the issue of lawful justification. *Id.* To successfully raise the defense of self-defense, the defendant must establish some evidence of each of the following elements: "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *Id.* at 128. "If the State negates *any one* of the self-defense elements, the defendant's claim of self-defense must fail." (Emphasis in original.) *Id.*

¶ 64　　Viewing the evidence in the light most favorable to the State, we find the State's evidence negated at least one of the elements of self-defense. We find it important to highlight the undisputed evidence demonstrated that, following a brief verbal argument, victim removed his child from the car, while at the same time, defendant walked inside his home, opened his safe, and retrieved a gun. Once outside, defendant and victim made eye contact, prompting, according to defendant, an "unhinged" victim to advance towards defendant's property. Despite the prior verbal

22

argument, defendant testified that victim did not speak to defendant while he advanced towards him.

¶ 65    Although it is undisputed that victim had a knife on his person, no evidence demonstrated that victim displayed his knife or vocalized a threat to stab defendant. Rather, the evidence could be viewed as discrediting defendant's assertion that victim " 'could have pulled the knife out in a matter of a half second, took a step, lunged and stuck it in me.' " Specifically, the evidence showed that victim's knife was secured in a sheath in his pocket before, during, and after defendant shot him, and the testimonies of Avery and Maycee confirmed that victim and defendant were not within arm's reach when defendant pulled the trigger. Moreover, defendant told Sergeant Hutson after the shooting that he shot victim because victim continued to advance into his yard. Defendant did not express at that time that victim threatened him, or that defendant felt in imminent danger. Instead, defendant vocalized he was not intimidated by victim and that victim had never threatened defendant in the past.

¶ 66    Additionally, no evidence, aside from defendant's own testimony, demonstrated that victim's right hand was near his knife. For support, defendant argues that Maycee and Simpson's testimonies corroborated defendant's testimony, where they testified that victim's hand was near the knife. The record simply does not support defendant's assertion. Even if this court ignored Avery's testimony altogether about the placement of victim's hands, neither Maycee nor Simpson testified that they saw victim's hand near the knife. Rather, Maycee testified that victim had his "arms out to his sides," while Simpson testified that victim walked with his hands down as victim and defendant walked towards each other. Neither Maycee nor Simpson testified that victim leaned his shoulder down and motioned to remove his knife from his pocket.

23

¶ 67    Moreover, the evidence simply does not support a finding that defendant needed to use deadly force. Not only was victim's knife unexposed and contained in the protective sheath at all times, but the record supports a finding that there existed no history of antagonism, violence, or threatening behavior or communication between victim and defendant at any point in time before June 8, 2021. In fact, testimony demonstrated that defendant and his family regularly socialized with victim and his family, and that defendant's children regularly spent time at victim's home without defendant. This evidence does not support defendant's contention that he felt victim would stab him. Furthermore, defendant, the only individual with a gun, could have walked inside his home and locked the door to protect him and his family. Instead, in the absence of any verbal or physical threats by victim, defendant, an individual trained in de-escalation tactics, chose to escalate the situation, resulting in victim's death.

¶ 68    Accordingly, viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the State sufficiently refuted defendant's defense of self-defense.

¶ 69    B. Imperfect Self-Defense

¶ 70    Defendant alternatively asks this court to find that he acted on the unreasonable belief that deadly force was necessary to defend himself from victim stabbing him. We are not persuaded.

¶ 71    Second degree murder is a lesser-mitigated offense of first degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48 (citing *Jeffries*, 164 Ill. 2d at 122). A person commits second degree murder when he commits the offense of first degree murder and, at the time of the killing, one of the following mitigating factors is present: (1) the defendant acted under a sudden and intense passion resulting from serious provocation by the individual killed but the defendant negligently or accidentally caused the death of the individual, or (2) the defendant believes the

24

circumstances to be such that, if they existed, would justify or exonerate the killing, but his belief is unreasonable. 720 ILCS 5/9-2(a)(1), (2) (West 2020).

¶ 72 To reduce first degree murder to second degree murder, the defendant must prove the existence of one of the mitigating factors by a preponderance of the evidence. *Jeffries*, 164 Ill. 2d at 129. The imperfect form of self-defense of second degree murder occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable. 720 ILCS 5/9-2(a) (West 2020); *Jeffries*, 164 Ill. 2d at 113. Whether a defendant's actions are justified by an unreasonable belief in the need for self-defense is a question of fact for the trier of fact to review. *People v. Washington*, 2012 IL 110283, ¶ 60. This court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the mitigating factor present. *People v. Blackwell*, 171 Ill. 2d 338, 357-58 (1996).

¶ 73 Applying these standards, we find no basis for reducing defendant's conviction to second degree murder. As discussed in detail above, the evidence rebuts defendant's assertion that he subjectively believed the use of force against victim was necessary for self-defense. Viewing the evidence in the light most favorable to the State, the jury reasonably concluded that defendant did not act with a subjective belief in the need for self-defense. Accordingly, we reject defendant's alternative argument.

¶ 74 C. *Lynch* Evidence

¶ 75 Defendant next argues that the trial court denied his right to present a complete defense and receive a fair trial by excluding crucial *Lynch* evidence of victim's reputation for violence and abuse of animals to support his self-defense theory. We disagree.

25

¶ 76    In *Lynch*, 104 Ill. 2d at 199-200, our supreme court held that evidence of the victim's aggressive and violent character may be offered to support the defendant's theory of self-defense to show that: (1) "the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior," and (2) "evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened." In the second situation, whether the defendant knew of the evidence at the time of the incident is irrelevant. *Id.* at 200. "When the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may introduce appropriate evidence of that character, regardless of when he learned of it." *People v. Johnson*, 172 Ill. App. 3d 371, 378 (1988) (citing *People v. Charleston*, 132 Ill. App. 3d 769, 773 (1985)). To be admissible under either theory, the evidence must be relevant to the victim's violent character. *People v. Cook*, 352 Ill. App. 3d 108, 127 (2004). The determination of the admissibility of evidence lies within the province of the trial court, and it may reject evidence, even relevant evidence, if it is remote, uncertain, or speculative. *People v. Figueroa*, 381 Ill. App. 3d 828, 840-41 (2008) (citing *People v. Morgan*, 197 Ill. 2d 404, 456 (2001)). A trial court's ruling regarding relevance and admissibility of evidence will not be reversed absent a clear abuse of discretion and manifest prejudice. *Id.* (citing, *e.g.*, *People v. Sutherland*, 223 Ill. 2d 187, 281 (2006)).

¶ 77    Here, defendant asserts that evidence of victim's prior violent and aggressive behavior against rabbits was admissible under the second factor to demonstrate that victim was the initial aggressor and support his version of the facts that led him to use force against victim to protect himself. We disagree.

26

¶ 78    The record supports a finding that not a single witness for the defense, aside from defendant, had firsthand knowledge or personally observed victim's alleged mistreatment of animals. Instead, the proffered testimonies of Tabitha, Zane, and Stephanie relied on information from other individuals, including Madison, whose testimony for the State discredited their version of the events. See *People v. Moretti*, 6 Ill. 2d 494, 523-24 (1955) (Reputation evidence may be utilized as *Lynch* evidence, but a reputation witness must have "adequate knowledge of the person queried about," and the reputation evidence "must be based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness."). Importantly, Madison confirmed that Avery and victim killed rabbits to feed Avery's pet python. Madison also confirmed that victim killed rabbits and placed the dead rabbits in bags. In addition, contrary to Tabitha and defendant's testimonies, Madison lacked any knowledge of any incident where victim broke the legs of rabbits or bit off their ears. Rather, contrary to proffered testimony, Madison recalled that Avery delivered an injured rabbit to defendant after Avery's pet python attacked the rabbit. Madison further testified that she could not recall a time when victim killed rabbits for any reason other than to feed Avery's pet python.

¶ 79    Moreover, both Zane and defendant testified that Madison and Christopher told them that victim, high on methamphetamine, slaughtered over 100 rabbits in the attic of his home. Madison, however, testified that, although victim used methamphetamine in the past, victim did not injure any rabbits while on methamphetamine. In addition, contrary to Zane's testimony that Madison and Christopher told him that victim abused Madison's dog, Madison testified that victim did not abuse or torture any dogs.

¶ 80    Lastly, although defendant testified that he witnessed victim abuse rabbits when he left them outside in the sun without food or water and "bash[ed] some of [the rabbits] off the concrete

27

walkway," we cannot find the trial court abused its discretion in excluding this evidence. The record demonstrates, and the court determined, that victim killed rabbits to feed Avery's pet python. Although the court referenced the potential that victim killed rabbits for pleasure, it found no correlation between that and the propensity for violence towards people. Based on the aforementioned, we cannot conclude that the court abused its discretion in excluding such evidence since the proffered evidence made neither the reasonableness of defendant's belief that deadly force was necessary nor made the proposition that victim was the aggressor more probable. See *People v. Florey*, 153 Ill. App. 3d 530, 540 (1987) (citing *People v. Rodgers*, 52 Ill. 2d 207, 215 (1972)).

¶ 81     We further note that, where evidence of the victim's propensity for violence should have been admitted, reversible error does not always occur if a trial court improperly excludes it. *People v. Armstrong*, 273 Ill. App. 3d 531, 536 (1995). Instead, such error is not reversible when it amounts to harmless error. *Figueroa*, 381 Ill. App. 3d at 846. When determining whether an error is harmless, a reviewing court may: "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." (Internal quotation marks omitted.) *In re Brandon P.*, 2014 IL 116653, ¶ 50 (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)).

¶ 82     As stated above in great detail, we conclude that properly admitted evidence overwhelmingly supported defendant's conviction for first degree murder. Additionally, the jury heard testimony from both Avery and Diana of victim's violent and aggressive character, specifically victim's 2019 battery conviction against victim's mother-in-law, Diana, which

resulted in a subsequent order of protection. Thus, we find that any error in the exclusion of victim's alleged mistreatment of rabbits was harmless, where the record shows that properly admitted evidence was presented from which the jury could have concluded that victim's prior conduct was violent.

¶ 83    D. Ineffective Assistance of Trial Counsel

¶ 84    Next, defendant argues that trial counsel was ineffective for failing to (1) elicit testimony from defendant regarding his knowledge of victim's mistreatment of rabbits to establish victim's reputation for violence and support defendant's theory of self-defense, and (2) request IPI Criminal 4th No. 24-25.09X. We disagree.

¶ 85    A defendant alleging ineffective assistance of counsel must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The right to effective assistance of counsel entails "reasonable, not perfect, representation." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). To prevail on a claim of ineffectiveness, the defendant must establish that his attorney's performance fell below an objective standard of reasonableness *and* this deficient performance prejudiced him. *Strickland*, 466 U.S. at 688. To establish prejudice, a defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 684. A reasonable probability is one that sufficiently undermines confidence in the outcome of the proceeding. *Id*. The defendant's failure to satisfy either prong of *Strickland* defeats an ineffective assistance claim. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). Thus, a reviewing court may resolve an ineffective assistance claim based upon only the prejudice component because a lack of prejudice renders irrelevant the issue of counsel's performance. *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998).

¶ 86    1. Testimony of Defendant's Knowledge of Victim's Reputation

¶ 87    Defendant argues that trial counsel's failure to elicit testimony from defendant regarding his knowledge of victim's mistreatment of rabbits amounted to ineffective assistance of counsel, where the trial court permitted trial counsel to elicit such testimony at the hearing on the State's motion *in limine* on November 12, 2021. Defendant specifically points to the following conversation in which trial counsel argued that excluding defendant's knowledge of victim's behavior towards animals would harm defendant. The court responded: "I think that [trial counsel] can ask that and solicit that he said this about animals. What my order was that we are not going into the three other people or other people coming in and talking about a reputation. [Defendant], I think, can testify to what he knows." The court proceeded to exclude defendant's testimony regarding the reputation of victim allegedly slaughtering animals; however, the court reiterated that "the defense has a right to ask did [defendant] give a reason why he thought it was s[elf] defense."

¶ 88    Even if we were to assume a deficiency on the part of trial counsel, defendant failed to show the requisite prejudice. The prejudice prong of the *Strickland* test requires the defendant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Although the record indicates that the trial court permitted trial counsel to elicit testimony from defendant about his state of mind at the time of the shooting, contrary to defendant's argument, the evidence against defendant was strong, as stated in great detail above. Accordingly, we find defendant was not deprived of his constitutional right to effective assistance of counsel in this instance.

¶ 89     2. Jury Instruction IPI Criminal 4th No. 24-25.09X

¶ 90     Defendant next argues that trial counsel provided ineffective assistance by failing to request IPI Criminal 4th No. 24-25.09X, which states: "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." We reject defendant's ineffective assistance claim, as we find that defendant failed to demonstrate either deficient performance or resulting prejudice.

¶ 91     We decline to find that trial counsel's failure to request the instruction was deficient performance. Trial counsel's choice of jury instruction is considered a tactical decision, within the discretion of trial counsel. *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010). The circuit court, here, instructed the jury on first degree murder, second degree murder, defendant's right to self-defense, and the theory that defendant had an unreasonable belief that self-defense was justified. Had the jury believed that appropriate circumstances existed, it could have found defendant not guilty. See *People v. Miller*, 259 Ill. App. 3d 257, 266 (1994) (not improper to refuse instruction of no duty to retreat when jury properly instructed on the defendant's theory of the case, self-defense). We also note that no requirement exists that IPI Criminal 4th No. 24-25.09X *must* be given whenever IPI Criminal 4th No. 24-25.09 is given. *People v. Alexander*, 408 Ill. App. 3d 994, 1002 (2011). Even if the instruction could have been "appropriate" in this case, as defendant contends, we cannot say that the absence of the subject jury instruction was so critical that it deprived defendant of a fair trial, especially where, as stated above, the trial court appropriately instructed the jury of self-defense and justification. See *id.* at 1003.

¶ 92     Even assuming that the failure to request this instruction constituted deficient performance, we would not find prejudice. Given the jury was properly instructed of self-defense and justification, we cannot say that there is a reasonable probability that the jury would have acquitted

31

defendant if it heard the additional instruction that a non-initial aggressor has no duty to retreat. See *People v. White*, 265 Ill. App. 3d 642, 651 (1994) ("[W]hen asserting an ineffective assistance claim[,] the defendant may not merely claim that the jury 'might have' applied a duty to retreat when it considered his self-defense claim; such an argument is merely speculation. The defendant must show that, had such an instruction been given, there is a reasonable probability that the outcome of the trial would have been different ***."). Accordingly, defendant's claim of ineffectiveness of counsel fails.

¶ 93    E. Illinois Supreme Court Rule 431(b)

¶ 94    Finally, defendant argues the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) when the court improperly questioned prospective jurors—four of whom were ultimately chosen as jurors—during *voir dire*. As a result, defendant argues the court committed clear and obvious error, which tipped the scales of justice against defendant in this closely balanced case. Defendant acknowledged that trial counsel did not object or raise the issue in a posttrial motion and, thus, forfeited the issue for review. *People v. Allen*, 222 Ill. 2d 340, 350 (2006). Therefore, we must determine whether defendant's forfeiture of the issue may be excused under the plain error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.")).

¶ 95    The plain-error doctrine allows a reviewing court to remedy a "clear or obvious error" in two circumstances, regardless of forfeiture: "(1) where the evidence in the case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence; or (2) where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009). Under either prong, the defendant bears

32

the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). A violation of Rule 431(b) is not a second-prong, structural error that requires automatic reversal under a plain-error analysis. *Id.* at 608. The first step under either prong of the plain-error doctrine involving an alleged Rule 431(b) violation is to assess if any error occurred (*People v. Walker*, 232 Ill. 2d 113, 124-25 (2009)), and our review is *de novo* (*People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007)).

¶ 96    Rule 431(b) is a codification of our supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472, 476-78 (1984), which held that the trial court erred by refusing the defendant's request to ask the venire about four fundamental principles of law. Rule 431(b) states as follows:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
>         The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Rule 431(b) mandates a specific question and response process, in which the jurors, either individually or in a group, are asked whether they understand and accept the enumerated principles. *Thompson*, 238 Ill. 2d at 607. The rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles. *Id.*

¶ 97    The critical issue before us is whether the trial court adequately asked the potential jurors if they both agreed with and understood these principles. According to defendant, while the trial court "asked multiple jurors the tenets of 431(b) in full," the court erred when it asked prospective jurors the following questions: "[I]f I were to ask you the same four questions, what would your answers be?" and "Do you have any reservations about any of them?" Specifically, defendant

33

contends that the court's method of questioning "did nothing to ensure that the potential jurors were paying attention or even heard the questioning of the previous jurors." We disagree.

¶ 98    Here, the trial court discussed the four principles set forth in Rule 431(b) with two groups of 12 prospective jurors. With the first group of 12 jurors, the court first asked three jurors the following four principles:

> "(1) Do you understand and accept that the defendant is presumed innocent of the charge against him? (2) Do you understand and accept that before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt? (3) Do you understand and accept that the defendant is not required to offer any evidence on his own behalf? (4) Do you understand and accept that the defendant's failure to testify cannot be held against him?"

All jurors answered in the affirmative to each question.

¶ 99    Immediately thereafter, the trial court individually asked three prospective jurors: "[D]o you understand and accept all four of those principles?" Each juror individually stated yes. The court then individually asked these three prospective jurors: "Do you have any reservations about any of them?" Each juror individually stated no. The court then individually asked three more prospective jurors the four principles as stated in the above paragraph. All jurors answered in the affirmative to each question. The court then individually asked the next three prospective jurors: "[I]f I were to ask you the same four questions, what would your answers be?" Each juror stated yes. Immediately after each of the three prospective jurors answered yes, the court individually asked each juror: "Do you have any reservations about any of them?" Each juror individually stated no.

34

¶ 100  Next, with the second group of 12 jurors, the trial court individually asked three jurors specifically about the four principles. All jurors answered in the affirmative to each question. Immediately thereafter, the trial court individually asked three prospective jurors: "[I]f I were to ask you the same four questions, what would your answers be?" Each juror stated yes. Immediately after each of the three prospective jurors answered yes, the court individually asked each juror: "Do you have any reservations about any of them?" Each juror stated no. The court then individually asked three more prospective jurors about the four principles. All jurors answered in the affirmative to each question. Immediately thereafter, the trial court individually asked three prospective jurors: "[I]f I were to ask you the same four questions, what would your answers be?" Each juror stated yes. Immediately after each of the three prospective jurors answered yes, the court individually asked each juror: "Do you have any reservations about any of them?" Each juror individually stated no.

¶ 101  Although the trial court did not specifically state each of the four principles to every single prospective juror, the court individually addressed each juror, providing each juror the opportunity to respond if they did not understand or accept any of the principles. Contrary to defendant's argument, there is nothing in the record that indicates the court acted in a manner that failed to ensure that the potential jurors were paying attention or heard the questioning of prior jurors. We cannot say the court's phraseology improperly conflated these fundamental principles, especially considering that the court expressly recited the four principles and then referred back to the "same *four* questions" when questioning subsequent jurors. (Emphasis added.) The record supports a determination that the court provided potential jurors an individual opportunity to respond with questions or to demonstrate a refusal to accept the principles. Therefore, we reject defendant's argument.

¶ 102 Because we conclude the circuit court committed no error in reciting the Rule 431(b) principles to the venire and inquiring about its understanding and acceptance of the principles, we need not consider defendant's contention under the plain-error analysis. See *People v. Birge*, 2021 IL 125644, ¶ 42.

¶ 103                                    III. Conclusion

¶ 104 For the foregoing reasons, defendant's Edgar County conviction for first degree murder is affirmed.


¶ 105 Affirmed.